of the auditor did not extend beyond the investigation and statement of the accounts, and that the report, when made, was not accepted and approved by order of the court, then we see no objection to postponing its consideration until the facts essential to fixing the basis on which the account shall be taken are ascertained in the manner we have indicated rather than directed. When these facts are established, if in favor of complainants, then the report may be recommitted with a view of ascertaining the several amounts for which the decree should be rendered; or if all of them should be found in favor of defendant, then no further investigation into the matters need be had. In saying that this report states results without giving the evidence, even in outline, on which it is made, and that it is meagre and imperfect as to facts and issues essential to the determination of the points in controversy, we design to cast no reflection upon the auditor; under the law as it stood when it was made, it perhaps could not have been otherwise, but as the law now stands, these deficiencies are obviated, and cannot, if its plain directions are followed, again occur. Code, §3097 (a) to (f).

Judgment reversed.

---

BECK vs. THE STATE OF GEORGIA.

1. Although a request to charge may have been, in the main, correct, yet where it was long, argumentative and in part incorrect, and the court gave the jury the law on the points involved therein as favorably as the accused was entitled to expect, a refusal of the request will not cause a new trial.

(a.) If the accused, who was arraigned for the murder of his wife, was drunk, and in consequence thereof did not know her or comprehend the nature of the act he committed, he would be responsible therefor, and would be a person of sound memory and discretion within the meaning of the law. If the drunkenness produced a temporary frenzy, madness or unsoundness of mind in the accused, he would not be excused or held irresponsible for the act done by him while laboring under such temporary insanity, madness or unsoundness of mind thus produced, it being his own vol-

untary act. But if the mania, insanity or unsoundness of mind, though produced by drunkenness, be permanent and fixed, so as to destroy all knowledge of right and wrong, then the person thus laboring under these infirmities would not be responsible.

2. Where a request to charge was fully covered by the general charge given, it was not necessary for the court to charge such request.

3. Where the defendant shot two persons at the same time, upon his trial for the murder of one of them, it was not admissible to show that the other stated to a third person a short time after the shooting that the defendant did the killing, "but would not have done it if he had been in his right mind." Such a statement was immaterial and was not a statement of fact constituting a part of the *res gestæ*, but was a mere expression of opinion.

4. There was no error in refusing to admit testimony that, prior to the homicide, when the defendant purchased a bottle of whiskey, he said he was going to quit, and that was the last drop he ever expected to drink. Such testimony was immaterial.

5. Where the court, in opening his charge to the jury, stated that momentous issues were involved in the case; on the one side, the good order, peace and security of society, and on the other the life and liberty of the defendant, and then proceeded to state the precise issues involved in the case, which he did fully and fairly, and cautioned the jury not to let prejudice, passion or excitement deprive the prisoner of any right to which he was entitled, the opening statement did no harm, and will not require a new trial.

6. The court correctly instructed the jury that malice was the deliberate intent unlawfully to take human life, whether it sprang from hatred, ill-will or revenge, ambition or avarice, or a mere frenzy of drunkenness.

7. There was no error in charging that the law presumes every person to be of sound mind, and the burden is upon the defendant to satisfy the jury, by evidence, to a reasonable certainty, that he was not of sound mind at the time of the commission of the act.

8. The eleventh ground of the motion for new trial contains certain remarks in respect to the human mind which might well have been dispensed with, but they were in no manner calculated to hurt or injure the accused.

9. There was no error in telling the jury to take the case without any preferences on their part, without any desire to convict an innocent man or to acquit a guilty one, but with the sole purpose of vindicating the law and finding the truth of the case.

10. The charge, as a whole, was a full and fair presentation of the law bearing upon the issues in the case. The case of the accused was fairly tried, and the law was as favorably expounded in his behalf as he had any right to demand.

11. The facts in this case show that the defendant murdered his wife

without any cause or provocation, while in a state of drunkenness produced and brought on voluntarily, without excuse or palliation; and the verdict of imprisonment for life is more merciful than he had a right to expect.

April 20, 1886.

Criminal Law. Insanity. Drunkenness. Evidence. *Res Gestæ.* Charge of Court. Malice. Before Judge ESTES. Rabun Superior Court. September Term, 1885.

Eugene W. Beck was indicted for the murder of his wife, Ella Beck. He pleaded not guilty. On the trial, the evidence for the state was in, brief, as follows:

On October 28, 1884, Beck went to the jail, and while there, talked to the town marshal about some hogs belonging to one Wall that kept getting into his lot. He stated also that the dogs kept getting into his kitchen, and asked the marshal to lend him his pistol, saying that he wanted to shoot some of the dogs. The marshal said he did not want to lend his pistol, that he might need it. Beck stated that the marshal could lend it to him for that night, and this was done. The marshal testified that, about a week or ten days (or perhaps two or three weeks or a month) before the shooting, there had been dogs around Beck's place; that Beck borrowed his pistol to shoot them; that the marshal heard a shot in the yard, and Beck said he had shot a dog; and that he returned the pistol the next day; that when Beck borrowed the pistol the last time, the marshal thought him sober; that he had been drinking "right smart" for a month or so—kept pretty tight all the time—that is, drinking every day; that he did not see Beck drink, but knew he was drinking; that there never was anything particularly wrong about him that the witness could see, and he did not know anything to the contrary of Beck's transacting his business as any other business man would; that he talked pretty sensibly about the Wall difficulty, his conversation being connected, as witness thought; that when

he talked about dogs, his conversation was connected and sensible; that the witness saw nothing irrational about him and thought him perfectly sane; that he was getting considerably sobered up and all right, and the witness would not have loaned him the pistol if he had not thought so; and that the impression on the witness's mind when Beck was talking about the Wall difficulty was that he believed the witness had some charge against him, but such was not the case, witness being after other parties concerned in it. That night, Beck sat in his wife's room and talked to her for some two hours about his mother's having shot at a lady; nothing else was talked of. Miss Bailey, the sister of Mrs. Beck, was then in the parlor talking to a young man. Beck's wife told him to go to bed. He said no, that he was going to the jail to see the marshal. He then sat down, pulled off his boots, lay on the bed " and went to sleep, or pretended to be asleep; he was snoring; his coat was off," (as stated by a servant in the house who was a witness). Shortly after he retired, he waked up and said, "I wish you would not do so much talking," and then went to sleep again, " or looked like he was asleep." Mrs. Beck made no reply, but worked on for a while; then undressed, said her prayers and went to bed. In about ten or fifteen minutes after Mrs. Beck retired, Miss Bailey came in. She went to bed with her sister, the defendant being on her bed. She said, " Brother Gene (the defendant) is not asleep; he is looking at me." About fifteen or twenty minutes afterwards, Beck got up, put on his coat and boots, walked to the lamp, which was near the bed where the two women were, and turned it down. Mrs. Beck said, " Please, Eugene, turn up the lamp." He turned the lamp so high, " it looked like the house was afire;" then jumped on the bed, held his wife down, and shot her through the head, killing her. He then turned to shoot the servant, who had lain down, but had not gone to sleep, and who ran out of the door, but the pistol snapped. He then held the cover with his left hand; and

with his right shot Miss Bailey, her head being under the
cover, the ball entering her back and coming out at her
breast, causing death. He then ran out of the door,
jumped off the piazza, and went to the jail. He ran into
the room where the marshal was and said, " Captain, they
have run in on me, and I have shot two of them." The
marshal told Beck to give him the pistol, which the latter
did. He said, " Don't let them hurt me." Hearing con-
tinued screaming, the marshal went out and learned that
Beck had killed his wife and sister-in-law. Returning, he
said to Beck, " Gene, you have killed your wife and sister-
in-law." Beck replied, " Well, I have killed the best
friend I have got." In about fifteen minutes, the sheriff
came and locked him up. He did not resist. He had a
little half-pint bottle about half full of whiskey. The ser-
vant testified that the defendant talked sensibly the night
of the shooting; that she never heard any fuss between
the husband and wife; that the latter taught school all
summer, and he worked on the turnpike a part of the time;
that she was a good woman and " easy to get along with;"
that about a month before the shooting, she told her hus-
band that if he did not quit drinking, she was going home
to stay with her father until he did quit, to which he made
no reply; that Mrs. Beck and her sister had not packed
their trunks preparatory to leaving; " there wasn't a thing
packed until that night that they was both lying there
corpses."

The servant stated also that, at the time of the homi-
cide, " he put on all his clothes, ready to run out, before he
done anything at all." Another witness, a doctor, testified
that, about ten days or two weeks before the shooting,
Beck told him about some dogs that had been bothering
him, having got into his kitchen; that the witness let him
have some strychnine for the purpose of poisoning them;
that after the homicide, he was present on the night of
October 30, at a conversation between Dr. Bailey and
Beck. The former asked the latter what was his motive

for killing his wife, and he replied that he did not know; that he had the *tremens.*

The state closed, and the defendant introduced testimony, in brief, as follows :

Beck's father and mother were married in 1843, and he was born in 1850. She was a "high-strung" woman and did some unusual acts. On one occasion, a man was cutting down a tree, which she claimed belonged to her husband; she went in between him and the tree and told him not to strike another blow; her husband was notified and carried her to the house; this was in 1845. At another time the same man, who was cutting the tree, went to their house, and was playing cards in her room, until late in the night, with her husband and another who claimed the land where the tree stood. She wanted her husband to go to bed, and threatened to burn the house if he did not do so. At another time, she shot at another woman who was with her husband. Beck's father was a drinking man, and had been "bad after women,". but the witnesses did not know that his wife was jealous. On still another occasion, when Beck was from seven to nine years old, his mother and he were seen by the driver of a wagon on the highway, about twelve miles from Clayton, going in the direction of Clarkesville. She asked to be allowed to ride, which was granted, but her husband came up and took them back towards Clayton. The woman who was shot at and the owner of the tree testified that they believed Mrs. Beck to be crazy. A witness testified that a cousin of the defendant had been adjudged insane and sent to the asylum. Another first cousin of the defendant would get on sprees, and after them would act strangely; on one occasion, after he had been drinking, he stuck a knife in his throat, and bystanders had to hold him to take it out. A witness for the defendant (Turpin) testified that he had known Beck for a long time; on the afternoon of the day of the killing, about two o'clock, he thought the defendant's conduct strange; his eye was

bright and seemed to sparkle, and he was nervous, appearing to be unable to control the motion of his head and hands; his conversation was not connected, and "it seemed like his mind was wandering;" from these appearances, the witness did not think his mind was all right during their conversation.

Another witness for the defendant (D. S. Duncan) testified that he had known the defendant a long time; that he had been drinking heavily for thirty-five or forty days before the homicide, but was not "keeping it up" that day; that he bought a quart of whiskey and went to play cards with the witness (who said he wanted to keep the defendant from getting more whiskey); that the defendant put his bottle in his pocket, and the witness did not know what became of it, except that the witness took two drinks of it, and they went up to the game of cards with a little half pint bottle full; that the defendant was more sober than the witness had seen him for a long time, but was nervous, and his eye seemed a little bright, looking differently from what it usually did when drunk; that generally he was a good euchre player, but that day he agreed to everything the witness said, could not keep count, and lost every game.

Dave Duncan, another witness for the defendant, and father of the preceding witness, testified that he had long known the defendant; that the latter had been drinking heavily for several weeks; that after the game of cards, the defendant stopped and they chatted for several minutes about their former sprees and about girls; that the defendant said he saw "buggers" night and day, and looked wild.

J. L. Ledbetter (a witness for the defendant) testified that when the defendant came to the jail, he asked to be killed with an ax; that he made no attempt to get away; that he asked to be locked up; and that, when the marshal stated that he had shot his wife and sister-in-law, he said: "I reckon it is not possible I have shot my wife;

if I have, I have shot the best friend I ever had in my life ;" and that he then turned over on the bed and cried a little.

M. C. Wilcox, for the defendant, testified, in brief, as follows: In March, 1882, the defendant came to the hotel kept by the witness, and took a room ; he seemed to have been drinking very hard ; he wanted liquor and could not get it. About eleven o'clock at night, the witness found him pacing the halls, and on being asked what was the matter, he said: " They are after me ! They are after me !" The witness found that he had deposited his money in three places. The witness gathered up the money, conducted the defendant to his room and tried to quiet him. About two o'clock in the morning, he roused the witness and the clerk by his repeated walking up and down the hall. The witness found that he had again deposited his money, and upon seeking to quiet him, the defendant said: " It is blood money." He was again conducted to his room, and the money was put into two packages and put in the safe. The next morning, when he was about to leave on the train, and the money was offered to him, he took one package, but refused the other. About a week afterwards, he wrote for the balance.

Dr. H. V. M. Miller was sworn for the defendant as an expert. He testified that he had had a great deal of experience in connection with diseases of the mind ; that *mania a potu* or *delirium tremens* was a disease resulting from drinking ardent spirits ; that the person suffering from such an attack would form imaginary conceptions of objects which had no existence, or, if they existed at all, the imagination would so change them as that the idea on the mind would not accord with the reality. After discussing the subject generally, and speaking of lack of motive as tending to indicate insanity, and the influence of heredity making a person more liable to be affected by ardent spirits, he was asked the following question :

"Now, in your judgment, as an expert witness, assuming that a man had lived for several years in a condition of apparent and, so far as is known, perfect affection with his wife and her family; supposing that there was no cause for estrangement between them; supposing that some two weeks or a month before the occurrence of the fact that I am about to relate to you, he had commenced a protracted spree of violent drinking, perhaps lasting thirty-five or forty days, and had drunk excessively for that length of time; that, at the expiration of that time, that thirty-five or forty days, he had ceased the excessive use of spirituous liquors; that during some week or ten days before, he had gone to a physician and had purchased some strychnine for the purpose of killing dogs that were infesting his place, his yard, that had been troubling him, had entered his kitchen and broken some utensils therein contained; that on the afternoon or evening, about sundown, of the day when the act was committed, he had gone to a friend, had borrowed a pistol for the purpose of killing the hogs or dogs that had been infesting his place, that had got into his kitchen and had broken something; that he had taken that pistol, carried it up to his house and placed it in the room where he slept, where his wife slept and his wife's sister; that he had lain down upon his bed and slept for an hour, after a conversation in the most friendly manner with his wife for some two hours; that he had lain down and slept for an hour, and then woke and complained of being roused by the conversation, and had dropped off to sleep again and slept for half an hour, with his clothes on, except his coat, his pants and his boots; that at the expiration of the second sleep of half an hour's duration, he again awoke, put on his hat and boots, walked to the lamp and turned it down, and then suddenly turns it up so high that there is danger of burning the whole house; that he then springs upon his wife's bed, seizes the pistol and blows her brains out, and immediately turns around, raises the cover and shoots his sister, snaps the pistol at the servant, who is in the room, runs out into the porch, springs off the piazza and runs to the jail, delivers the pistol, which he had borrowed from the town marshal, saying, 'They have run in on me, and I have got two of them,' begging the town marshal to protect him; that in the afternoon of that day, he had appeared to his friends to be sober; that he had begged to be knocked in the head with an ax after this transaction, and when they refused to do that, he asked to be locked up:—now, doctor, under this condition of facts, which I have stated, what, in your judgment, as an expert, would you say was the condition of that man's mind at the time of the homicide?"

Answer: "Taking that to be a true exposition of the facts, I should say that the man was unquestionably insane."

Dr. J. P. Phillips concurred with Dr. Miller in his testimony.

The defendant's statement was as follows:

"Well, as everybody knows, I have been a drinking man all my life; and preceding the terrible tragedy on my wife and sister-in-law, I had been drinking heavily for thirty or forty days. I had been trying to sober off for several days preceding that, and had been tapering off and doing my best, and the day of the tragedy I had drunk very little liquor. I was playing cards with Duncan, and became nervous, and imagined that I could see things coming upon me. I don't remember of shooting my wife or her sister, nor do I remember anything about its being told me until next morning when I was in jail; I didn't realize anything about it until after my commitment trial here in court. My wife and I lived together friendly; she was kind to me through my drinking sprees until I got sober, and then asked me to quit it, and I always thought I would. I loved her as good as I did my own mother, and she loved me. That is about the only statement that I wish to make, sir."

The defendant closed, and the state, in rebuttal, introduced testimony, in brief, as follows: The defendant had been conducting business during the summer up to October, and had settlements in that month. He appeared rational and kept the accounts and made the settlements satisfactorily. About twelve o'clock on the day of the homicide, he made a settlement of an account involving several small items. He called them over twice, naming them correctly. That afternoon, he was on the croquet ground, where his wife and sister, with others, were playing. He appeared to be drunk, or at least drinking, but did not appear otherwise different from his usual manner. He was considered a dangerous man when drinking. On the day after the homicide, an attorney went to the jail to get him to make a transfer of some property as part of a settlement. He testified that the defendant talked as rationally as any man about his business; that he had been engaged in connection with this settlement a week or ten days before that time; and that the defendant was then drinking considerably, but talked sensibly, though in the scattering manner of a person drinking. A physician, who stated that he had made some study of insanity, but had no actual experience, testified that the best authority

placed the duration of *delirium tremens* at from three to five days; also, that when the defendant obtained the strychnine ten days or two weeks before the killing, he seemed sober and his mind clear. He talked sensibly when being removed to jail at Gainesville a few days after the homicide. Two witnesses testified that, during the month of October, they had heard the defendant talking loudly and had seen his wife crying.

A. J. Julian testified for the state, in brief, as follows: Beck's wife and the witness's wife were sisters. The witness, a brother of Mrs. Beck, and another went to the jail forty-three to forty-six hours after the shooting. In answer to questions, the defendant stated that, on the fatal night, he lay down; afterwards got up and put on his pants and coat; that no one else was up; that he remembered dressing; that he started out of the door and some one told him to turn up the lamp; that he heard a noise and began shooting; that he did not remember whether he was shooting at hogs or dogs or burglars; that some burglars had broken into his dining-room, and he might have been shooting at them; that he remembered shooting twice; that he then went to the jail and gave himself up; that it was not long before they came in and told him he had killed his wife and sister-in-law, and he responded, " If I have, I have killed the best friend I had." The witness said that the defendant had made a wound in the hearts of the family that never would be healed, to which the defendant replied that he knew he had; that he had committed a crime for which he would have to be hung; that he expected to plead guilty when the jury were empanelled; and that he wanted to be hung to make an example for the young men of Rabun County of the evils of whiskey-drinking. The witness was not talking to Beck for the purpose of obtaining evidence, but to see how he felt. Witness is responsible for the fees of the prosecuting attorneys.

The jury found the defendant guilty, and recommended

his imprisonment for life. He moved for a new trial on the following grounds:

(1), (2.) The verdict is contrary to law and evidence.

(3.) The court erred in refusing a request to charge as follows : " One of the essential elements of murder in this state is that the homicide must be committed by a person of sound memory and discretion ; now, while every person is presumed to be sane, still when the defence relied upon is insanity, and evidence is before you on the question of sanity, it is your duty to weigh the testimony upon that point just the same as any other necessary ingredient of the crime; and if, after a survey of all the testimony in the case, you have a reasonable doubt as to his sanity at the time of the commission of the act, you cannot find him guilty, and he is entitled to an acquittal at your hands."

(4.) The court refused to charge as follows : " If you are satisfied from the evidence that the defendant designedly shot Ella Beck with a pistol, in such a manner as did cause death, no provocation whatsoever being given at the time, then, in point of law, the killing was of malice aforethought, unless you should also find that the defendant, when he did the act, was so far from sane as to be incapable in law of entertaining malice ; for the rules of law concerning malice are all based upon the assumption that the person who struck the blow was at the time in such state of mind as to be responsible criminally for his act. If he was then so insane that the law holds him irresponsible, it deems him unable to entertain legal malice ; and therefore no malice is, in that case, to be inferred from his act, however atrocious it might have been. One main inquiry, therefore, is, was the defendant, when he fired the shot, so far insane as to be held by the law irresponsible for the homicide of Mrs. Ella Beck ? The law supplies a test by which the jury is to ascertain whether the accused be so far insane as to be irresponsible ; that test is, the capacity to distinguish right from wrong as to the par-

ticulars with which the defendant is charged. If he understands the nature of his act; if he knows his act is criminal, and that if he does it he will do wrong and deserve punishment, then, in the judgment of the law, he has a criminal intent, and is not so far insane as to be exempt from responsibility. On the other hand, if he is in such delusion as not to understand the nature of his act, or if he has not sufficient sense and reason and judgment to know that he is doing wrong, or not sufficient mind to discover that his acts are criminal and deserve punishment, then he is not responsible. This is the test which the law prescribes, and these are the inquiries which you are to make on this part of the case; did the defendant understand the nature of his act when he shot Mrs. Ella Beck; or, to apply them more nearly to this case: did the defendant know that he was killing Mrs. Ella Beck; that so to do was criminal and deserved punishment? If so, he had the criminal intent necessary to convict him of murder; if not, he was not a person of sound memory and discretion at the time of the commission of the act and it would become your duty to acquit him."

(5.) Because the court refused to charge as follows: "It is asserted by the defendant that, at the time he struck the blow, he was suffering under a disease known as *delirium tremens.* He has introduced evidence tending to prove his intemperate drinking of ardent spirits for sometime previous to the time in question, and also certain effects of intemperance. Physicians, who are claimed to be experts from observation of this disease, and from the study of its character and symptoms, have been examined. It is not the province of experts to draw inferences of fact from the evidence, but simply to declare their opinion upon a known or hypothetical state of facts ; and, therefore, counsel have put to the witnesses such a state of facts as they deem warranted by the evidence, and have taken their opinions thereon. If you consider such state of facts proved, then the opinions thereon are admissible evi-

dence to be weighed by you. Otherwise, these opinions are not applicable to the case. And here I may remark, gentlemen, that generally witnesses are competent only to state facts; yet this rule does not exclude the opinion of those whose profession or studies or occupation are supposed to have rendered them peculiarly skillful concerning questions which arise in a trial, or which belong to some particular calling or profession. We have the opinions of physicians in this case for the same reason that we resort to them in our own cases out of court, because they are believed to be better able to form a correct opinion upon a subject, within the scope of their studies and practice than men in general, and, therefore, better than the jurors composing your panel."

(6.) Because the court refused to allow the defendant to prove by Hon. J. I. Langston that, when the pistol-shot was fired, he ran immediately into the house and room as fast as he could, having only about 300 feet to run, and found Ella Beck lying dead on the bed, and Addie Bailey lying on the edge of it, in, as he supposed, a dying condition; that he asked her who shot Ella and herself, to which she replied, "Brother Eugene; but he never would have done it if he had been in his right mind."

(7.) Because the court refused to allow the defendant to prove by Jeff. Duncan that, on Monday, when the defendant bought the pint of whiskey, he said he was going to quit, and "that was the last drop he ever expected to drink;"—it being the theory of the defendant that he was then getting off of a prolonged spree, and intended to use the whiskey to taper off on, and it being a declaration accompanying an act.

(8.) Because the court erred in charging the jury as follows: "The defendant, Eugene W. Beck, is on trial before you, charged with the offense of murder. No more momentous issues can be presented than are involved in this case. On the one hand is the life or liberty of the defendant, on the other the peace, the safety, the protection

and the welfare of society." [The court then proceeded to state the precise issues involved in the case.]—The objection was that no such issue or issues were presented in the case. As stated, if the defendant was not hung or imprisoned for life, " the peace, the safety, the protection and the welfare of society " were endangered. Therefore, as presented to the jury at the very opening of the charge, the case was one in which, in the opinion of the court, solemnly and emphatically asserted, " the peace, the safety, the protection and the welfare of society " required the conviction of the defendant.

(9.) Because the court charged the jury as follows: " You perceive that malice is a necessary ingredient in the crime of murder. Malice in law has a different meaning from what it has in the popular idea. The popular idea of malice, in its sense of revenge, hatred and ill-will, has nothing to do with the case. We will endeavor to explain or illustrate to you the difference between the popular idea of malice, and that legal malice which forms a necessary part of the legal crime of murder. The mother who destroys her infant to conceal her own shame has legal malice, though in point of fact she may feel no hatred to any human being in the world, nor any indifference to human life in general, and may actually have the yearnings of a mother's love towards her innocent victim; and yet her crime is called murder. Here is no malice in the popular sense, and yet the law says there is malice, and that the killing is murder. The legal idea of malice in the crime of murder is simply an intent to kill a human being in a case where the law would neither justify, nor in any degree excuse, the intention; whether this intent springs from hatred or a sense of shame, or a mere frenzy of drunkenness, it is malice, it is the mental constituent of murder, unless there is something to justify the intent, or in some degree to excuse it."—It is objected that the illustrations used by the court were not proper to the case, and were calculated to impress the jury with the belief

that, in the opinion of the court, a verdict of guilty should be rendered in this case. It is further insisted that the reference to " a mere frenzy of drunkenness," as being the origin of the intent to kill, was calculated to destroy the effect of the defence made by the defendant. There is no such condition as the " frenzy of drunkenness," unless it be that mental state known to the law as *delirium tremens*, which is insanity, and which excuses from crime.

(10.) Because the court charged as follows: " The law presumes every person to be of sound mind, and the burden is upon the defendant to satisfy the jury by evidence to a reasonable certainty that he was not of sound mind at the time of the commission of the act. Our penal Code declares that 'A person shall be considered of sound mind who is not an idiot, a lunatic, or affected by insanity,' and who has arrived at the age of fourteen years, or before that age, if such person know the distinction between good and evil."—It is insisted that it was the duty of the court here to define the character of mental unsoundness, which excuses a person from responsibility, upon the criminal side of the court, for his acts. The quotation from the penal Code indicates a condition of the mind which is permanent, and has no reference, as would be ordinarily understood by a jury, to that unsound mental condition which may temporarily arise from bodily disease or other infirmity.

(11.) Because the court charged as follows: " By the definition of murder, the person killing must be a person of sound memory and discretion. Sound memory and discretion are merely relative terms. They do not mean that the person killing shall be a person of absolutely sound mind. If this were required, perhaps no one would ever be guilty of murder. It is often questioned, even by high authority and by very learned men, whether any human being has a perfectly sound mind or not. No human learning has ever been, or ever will be, able to look into the human mind and know its purposes and intents.

This knowledge of human thought, intent, purpose, judgment and reason is possessed alone by the Creator."

(12.) Because the court charged as follows: " Now, gentlemen of the jury, the case is before you. Take it, and without any preferences on your part as to what the finding should be, without any desire to convict an innocent man, without any desire to acquit a guilty man, but with the sole purpose of vindicating the law, and finding the truth of this case, go to your jury-room, consider the case, and as you shall believe from the evidence, so find."

(13.) Because the entire charge was so framed as to exclude from the consideration of the jury the defence made by the defendant, and to impress upon their minds, with all the ability of the learned judge, that the vindication of the law, as well as the peace, good order and safety of society, required the conviction of the defendant. It erroneously failed to explain to the jury the effect of the defence of insanity from *delirium tremens*, and to instruct them in clear and explicit language that if the defendant, at the time of the homicide, did not know the distinction between right and wrong as the result of a disease known as *delirium tremens* or *mania a potu*, he should be acquitted.

The motion was overruled, and the defendant excepted.

HENRY JACKSON; E. K. LUMPKIN; POPE BARROW, for plaintiff in error, cited, on insanity: Whart. & Stillé, Med. Jur., §§202, 203, 107-9; Ray Med. Jur., §§545-6; 2 Taylor Med. Jur., 490, 599; 10 Tex., 700; Lawson Insanity, 845, 54; 1 Curt., 1; *Harris vs. Central R. R.* (present term). On exclusion of statement of Miss Bailey: Code, §§3773, 3771; Roscoe Cr. Ev., 24; 1 Gr. Ev., §§108, 440-1, 101, 102; 1 Wall., 637; 8 *Id.*, 397; 55 Pa., 402; 1 *Ga.*, 230; 5 *Id.*, 85; 11 *Id.*, 622; 43 *Id.*, 197; 64 *Id.*, 416, 53; 65 *Id.*, 99; 67 *Id.*, 464; 55 *Id.*, 701; 69 *Id.*, 72; 72 *Id.*. 217; 71 *Id.*, 152; 4 Bing., N. C., 489; 1 Phil. Ev., 189.

CLIFFORD ANDERSON, attorney general, by J. H. LUMPKIN; W. S. ERWIN, solicitor general, by FRANK L. HARALSON; CLAUD ESTES; C. D. PHILLIPS; H. L. PATTERSON, for the state, cited, on insanity: 75 *Ga.*, 614; 56 *Id.*, 463; Hale's P. C., ch. 4, p. 32; Whart. Cr. L., §§48, 49; 10 *Ga.*, 47; Code, §§4294, 3749; 31 *Ga.*, 424, 456, 460–1; 42 *Id.*, 10; 47 *Id.*, 553; 58 *Id.*, 296; 7 *Id.*, 12; 45 *Id.*, 56, 57, 68, 74; 57 *Id.*, 190; 3 *Id.*, 310; 59 *Id.*, 154; 29 *Id.*, 606; 45 *Id.*, 225; 5 Mason (U. S.), 28; Russ. Cr., 24. On declaration of Miss Bailey: Code, §3781; Whart. Hom., §746; 38 *Ga.*, 50, 70; 53 *Id.*, 272; 22 *Id.*, 47 ; 30 *Id.*, 400, 411. On statement of defendant: 71 *Ga.*, 128; 72 *Id.*, 164; 45 *Id.*, 225. On charge of court, 7 *Ga.*, 139; Whart. Cr. Ev., §§335, 340; 18 Cent. L. J., 402; 18 N. C., 610; 71 Mo., 173; 61 Cal., 246; 33 Grat., 807; 10 O. St., 598; 16 Vroom (45 N. J.), 203; Russ. Cr., 19; 1 Strob. (S. C.), 479; 7 Gray, 583; 6 Jones (N. C.), 366; 82 *Id.*, 63; 20 Cal., 518; 34 Mo., 53; 2 Gr. Ev., 373.

BLANDFORD, Justice.

The plaintiff in error was indicted, tried and found guilty of the murder of his wife, Ella Beck, in the superior court of Rabun county. He made a motion for new trial on many grounds, which being denied by the court, he excepted to such refusal, and assigns as error the several grounds taken in his motion for new trial.

The first two grounds in the motion will be considered last.

The third ground was abandoned by the counsel for plaintiff, as the same was ruled adversely to them in *Danforth's* case, decided at the last term of this court, 75 *Ga.*, 614.

1. The fourth ground contains a long request to the court to charge the jury, which is argumentative, and in the main correct; but, from an examination of the charge which the court did give the jury on the points involved in the request,

it will be seen that he gave law as favorably to accused as he was entitled to. The latter part of this request should not have been given by the court, under the facts of this case, without qualification, and this constitutes the cream of the request, which is, " Did he know that he was killing his wife; if not, he was not a person of sound memory and discretion, and it would become the duty of the jury to acquit him." If the accused was drunk, and in consequence of that drunkenness, he did not know his wife, or comprehend the nature of the act he committed, he would be responsible for the act and be a person of sound memory and discretion within the meaning of the law. If the drunkenness produced a temporary frenzy, madness or unsoundness of mind in the accused, he will not be excused or held irresponsible for the act done by him while laboring under such temporary insanity, madness or unsoundness of mind thus produced, because it is his own voluntary act; he put himself in that condition, and must abide all its consequences.

But if the mania, insanity or unsoundness of mind, though produced by drunkenness, be permanent and fixed, so as to destroy all knowledge of right and wrong, then the person thus laboring under these infirmities would not be responsible. The insanity must be fixed and permanent, and such we understand to be the ruling of this court in *Choice vs. The State*, 31 *Ga.*, 424. Undoubtedly this was the common law. 1 Hale's P. C., 32. It is there stated that " although the simplex frenzy occasioned immediately by drunkenness excuse not in criminals, yet if by one or more such practices an habitual or fixed frenzy be caused, though this madness be contracted by the vice and will of the party, this habitual and fixed frenzy thereby caused puts the man in the same condition in relation to crimes as if the same were contracted involuntarily at first." 4 Coke, §125(a).

Blackstone, in the 4th book of his commentaries, page 26, says, " As to artificial, voluntarily contracted madness

by drunkenness or intoxication, which, depriving men of their reason, puts them in a temporary frenzy, our law looks upon this as an aggravation of the offense, rather than as an excuse for any criminal misbehavior."

We think that these principles, laid down by these sages of the law, are as true and correct now as they were when uttered, and are as applicable to the present condition of society.

Our law declares that "drunkenness shall not be an excuse for any crime or misdemeanor." Code, §4301.

2. As to the fifth assignment of error, what has been said in reference to the fourth ground applies equally to this. We think that the request contained in this ground was fully covered by the court in his general charge to the jury, and when this is so, the court need not give a request in charge, however proper the same may be, or free from infirmities.

3. The sixth ground complains that the court erred in refusing to allow the accused to prove that Miss Bailey said shortly after the homicide, that Eugene Beck killed her sister (Beck's wife), but he would not have done it if he had been in his right mind.

We think the court did right to exclude this evidence: first, because it was immaterial; second, because the opinion of the witness as to the condition of the mind of the accused was not a statement of a fact connected with the transaction so as to form a part of the *res gestæ*. If she had been upon the stand as a witness, she could not have given her opinion without stating the facts upon which it was based.*

4. The seventh ground complains that the court refused to allow accused to prove by Jeff. Duncan that, on Monday before the homicide, when accused bought a pint of whiskey, he said he "was going to quit; that was the last drop he ever expected to drink." This testimony was wholly immaterial; it threw no light upon the transaction.

---

*See *Carr vs. State*, (present term.)

He bought the whiskey to drink, and whether that was the last, and he intended to stop, in nowise tended to show his guilt or innocence. It was properly rejected.

5. The eighth ground complains of the manner in which the court presented the case to the jury; that he spoke of the momentous issues involved in the case—on the one hand, the good order, peace and security of society; on the other, the life and liberty of the defendant; but the court followed by stating the precise issues involved in the case, and this was done fully and fairly, and the jury were duly cautioned not to let prejudice, passion or excitement deprive the prisoner of any rights to which he was entitled. The statement complained of did the prisoner no harm. A charge similar to this was approved by this court in *Choice's* case above referred to.

6. The ninth ground complains of the charge of the court upon the subject of malice. The court correctly instructed that malice was a deliberate intent unlawfully to take life, whether it sprang from hatred, ill-will or revenge, ambition or avarice, or a mere frenzy of drunkenness. There certainly is no error in this, from the view we entertain of drunkenness.

7. In the tenth ground of the motion for new trial, we think that the error here complained of was settled adversely to plaintiff in error in *Danforth's* case. See also *Loyd's* case, 45 *Ga.*, 64; *Westmoreland's* case, *Ib.*, 225; *Carter's* case, 56 *Ga.*, 463.

8. The eleventh ground complains of certain remarks of the court, which could well have been dispensed with, but they were in no manner calculated to hurt or injure the case as made by the accused.

9. In the twelfth ground, complaint is made that the court erred in telling the jury to take the case without any preferences on their part, without any desire to convict an innocent man or to acquit a guilty one, but with the sole purpose of vindicating the law and finding the truth, etc. We can see nothing in this part of the charge complained of. It is the duty of the jury to vindicate the law.

10. The thirteenth ground alleges as error the entire charge of the court.

Having duly considered the entire charge delivered by this able and upright judge to the jury, we think it full and a fair presentation of the law bearing upon the issues in the case; that the accused has had his case fairly tried, and the law as favorably expounded in his behalf as he has any right to demand.

11. The first and second assignments of error are that the verdict is contrary to law and contrary to the evidence. All that we can say is, as it appears to us from the facts in the record, the plaintiff in error killed and murdered his wife, without cause or provocation, while in a state of drunkenness produced and brought on voluntarily. There is no excuse or palliation of this offered, and the verdict of the jury was more merciful than he had a right to expect.

Judgment affirmed.