[No. 48483-0. En Banc. February 3, 1983.]

THE STATE OF WASHINGTON, *Respondent*, v. JOHN PAUL WICKS, *Petitioner*.

*James D. Hamilton,* for petitioner.

*Arthur D. Curtis, Prosecuting Attorney,* and *Richard Melnick, Deputy,* for respondent.

STAFFORD, J.—Defendant John Wicks appeals from a judgment and sentence imposed following his conviction of two counts of second degree assault and one count of third degree assault. There is no question defendant committed the several acts which form the basis for the charges against him.

At trial, defendant offered two defenses: (1) he was too intoxicated to form an intent to commit the crimes charged, and (2) he was insane at the time the three acts were committed. The jury was instructed on the subject of voluntary intoxication and rejected that defense. The trial court refused, however, to submit the issue of insanity to the jury.

Defendant assigns error to the trial court's rejection of the insanity defense. He contends there was sufficient evidence of insanity to submit the issue to the jury. We do not agree. The record is devoid of substantial evidence to support a plea of insanity.

A plea of insanity is an affirmative defense. An

accused has the burden of sustaining it by a preponderance of the evidence. It is error to instruct the jury on the defense of insanity absent substantial evidence. *State v. Tyler,* 77 Wn.2d 726, 739, 466 P.2d 120 (1970), *vacated as to imposition of death penalty,* 408 U.S. 937, 33 L. Ed. 2d 756, 92 S. Ct. 2865 (1972); *see also State v. Johnson,* 92 Wn.2d 671, 683, 600 P.2d 1249 (1979). Further, two statutes bear upon this defense. RCW 9A.12.010 provides:

> To establish the defense of insanity, it must be shown that:
> (1) At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:
> (a) He was unable to perceive the nature and quality of the act with which he is charged; or
> (b) He was unable to tell right from wrong with reference to the particular act charged.

RCW 10.77.010(7) provides that:

> No condition of mind proximately induced by the voluntary act of a person charged with a crime shall constitute "insanity".

Thus, pursuant to RCW 10.77.010(7), evidence of voluntary intoxication, by itself, is insufficient to justify an insanity instruction.[1] This is so even if defendant although sane suffers from a preexisting mental illness. The voluntary use of intoxicants is the direct and immediate cause of insanity, not the preexisting mental illness. *United States v. Jewett,* 438 F.2d 495 (8th Cir)., *cert. denied,* 402 U.S. 947 (1971); *State v. Booth,* 169 N.W.2d 869 (Iowa 1969); *Evilsizer v. State,* 487 S.W.2d 113 (Tex. Crim. App. 1972).

Finally, even chronic addiction to alcohol does not, by itself, constitute insanity. *Seattle v. Hill,* 72 Wn.2d 786, 798, 435 P.2d 692 (1967), *cert. denied,* 393 U.S. 872 (1968). But, "'if the mania, insanity or unsoundness of mind,

---

[1]*State v. Bower,* 73 Wn.2d 634, 440 P.2d 167 (1968). *See also State v. Rio,* 38 Wn.2d 446, 230 P.2d 308 (1951); *State v. Huey,* 14 Wn.2d 387, 128 P.2d 314 (1942); *State v. Brantley,* 11 Wn. App. 716, 525 P.2d 813 (1974); Hasse, *Drug Intoxication and Criminal Responsibility: Old Dilemmas and a New Proposal,* 16 Santa Clara L. Rev. 249, 259 (1976).

though produced by drunkenness, be permanent and fixed, so as to destroy all knowledge of right and wrong, then the person thus laboring under these infirmities would not be responsible."'" *State v. Huey,* 14 Wn.2d 387, 396, 128 P.2d 314 (1942), quoting *Beck v. Georgia,* 76 Ga. 452 (1886). *See also State v. Miller,* 177 Wash. 442, 32 P.2d 535 (1934). Thus, the only time alcohol and drug related insanity may successfully be used as an insanity defense is when the influence of alcohol or drugs triggers an underlying psychotic disorder of a settled nature, such as delirium tremens. *See* Note, *Intoxication as a Criminal Defense,* 55 Colum. L. Rev. 1210, 1219 (1955).

We decline to depart from this position, for, as stated by Justice Hale in *State v. Bower,* 73 Wn.2d 634, 646, 440 P.2d 167 (1968), "To hold otherwise would allow one to steel his nerves, blanket his conscience, and fortify his resolve by taking drugs in preparation for a criminal enterprise."

Thus, while keeping in mind that insanity caused by voluntary intoxication does not constitute a defense, we now turn to the record itself to determine whether there was substantial evidence warranting an insanity instruction.

Those testifying at trial included several members of defendant's family, several witnesses to the incident, and three mental health professionals. Family members testified that defendant, age 29 at the time of trial, has been mentally disturbed and has manifested irrational behavior since he sustained a severe head injury at the age of 14 months. According to his mother, part of defendant's difficulties have been attributed to organic brain damage which brought on a condition described as psychomotor epilepsy, although the mental health experts disagree as to whether he truly suffers from that disease. In October of 1972, 6 years prior to the incident in question, he was shot and fragments of three of the six bullets that penetrated his body remain in his head, near his left temple, pressing on vital nerves. The defendant allegedly suffers from seizures and/or blackouts, and the blackouts have become more frequent in recent times. He has been repeatedly hospitalized

in mental institutions in several states since he was in the eighth grade, including 14 confinements at Dammasch State Hospital in Oregon. Moreover, he has attempted suicide at least four or five times. His mother further testified that he is supposed to take 100 milligrams of Dilantin four times a day for epilepsy and 50 or 75 milligrams of Thorazine each day.

Several days before the incident, defendant spent two days drinking "quite a bit" of beer. Family members testified his eyes "were glassy", he was "kind of belligerent", and he had been taking "pain pills". His sister testified that "he drank between 15 and 20 quarts of beer" and had been sniffing "pain pills" in a protracted spree during the 2 days preceding the assaults. His mother testified that when he mixes pain pills and alcohol, "he just goes berserk." Defendant's brother testified that at the time of the incident, the defendant was "wild–eyed" and "drooling"; his eyes were "glazed"; and he looked "[c]razy, like he didn't know what was going on."

The record of defendant's repeated hospitalizations from 1963 to 1978 indicates that most frequently the triggering event which necessitated institutional care was an excessive voluntary ingestion of alcohol or drugs. The psychiatrist who testified on behalf of the defense stated that defendant has an underlying condition which the physician called "chronic undifferentiated schizophrenia" and which continues regardless of defendant's use of alcohol or other drugs, but that if defendant "takes speed or alcohol it's probably going to make things worse." This psychiatrist was of the opinion that at the time defendant committed the three assaults he was suffering from a condition called toxic psychosis (that is, a severe mental disorder caused by some toxic substance) which produced such confusion of mind that he did not "really understand" that someone might be frightened by his display and use of the gun. This psychiatrist qualified his testimony by concluding that it was the most recent and massive exposure to alcohol and drugs

which produced the toxic psychosis. Cross examination of the physician produced the following testimony:

Q Is it the toxic psychosis then or that term that makes him legally insane in your opinion?
A In my opinion, yes.
Q So without the use of alcohol and drugs, in your opinion, he would not be legally insane or would not have been at that time, is that correct?
A Not at that time. I can't say what might happen some other time.
Q But relating to these specific sets of charges?
A Yes.

Report of Proceedings, at 229–30.

Other evidence in the record does not support defendant's contention that he was insane at the time he committed these assaults. A second psychiatrist dismissed any effect from defendant's preexisting mental illness. He testified defendant's strange behavior simply evidenced "sociopathic symptoms" but did not indicate defendant was unable to understand the nature and quality of his acts. This psychiatrist opined, however, that at the time defendant committed the assaults, "he was insane" in the sense that he "did not understand the nature and quality of his acts." The psychiatrist explained that defendant's consumption of alcohol and other drugs produced "a toxic brain condition which would be something like a severe drunk." A clinical psychologist testified that defendant may have had some brain damage since childhood, but concluded defendant was sane when he committed these assaults.

In sum, the evidence demonstrates defendant suffers from some form of mental illness which is aggravated by the abuse of alcohol and other drugs. In addition, the evidence indicates defendant may have suffered from toxic psychosis caused by the abuse of alcohol and drugs at the time of the incident. Thus, defendant may not avail himself of the insanity defense since his alleged insanity was voluntarily achieved through the abuse of intoxicants such as

alcohol and drugs.[2] Moreover, save for the 2–day spree culminating in the assaults, there is no evidence of permanent impairment of the mind induced by repeated bouts of drunkenness.

The judgment of the Court of Appeals is affirmed.

WILLIAMS, C.J., and ROSELLINI, BRACHTENBACH, DOLLIVER, DIMMICK, and PEARSON, JJ., concur.

UTTER, J. (dissenting)—I concur in the result reached by the dissent. The defendant produced sufficient evidence to at least raise a jury question. There was evidence that his mental condition at the time of the alleged offense was not the sole result of intoxication but was caused by an underlying mental illness triggered by alcohol consumption. There was also evidence produced that the defendant was not aware of the atypical effect which alcohol would have on him. Underlying insanity triggered by alcohol consumption is a defense if the defendant was unaware that alcohol would trigger his mental condition and in the present case the jury should have been so instructed.

The crucial distinction which must be made is between voluntary and involuntary action. The majority correctly notes that an inability to perceive the nature and quality of one's acts or to tell right from wrong does not constitute legal insanity if brought on by voluntary intoxication or some other voluntary act. RCW 9A.16.090; RCW 10.77-.010(7). Such inability does constitute legal insanity, however, if brought on by an *involuntary* act. *See State v. Mriglot,* 88 Wn.2d 573, 575, 564 P.2d 784 (1977) (involun-

---

[2]Our decision is consonant with the opinion of the Court of Appeals for the Eighth Circuit in *United States v. Jewett,* 438 F.2d 495, *cert. denied,* 402 U.S. 947 (1971), wherein that court rejected defendant's appeal of a trial court's refusal to give an insanity instruction. In *Jewett,* defendant suffered injuries similar to those of defendant Wicks, including severe head injuries and epileptic seizures. He had been institutionalized for 3⅓ years, released and adjudged sane just prior to the commission of the offense. The testimony of the psychiatrist who testified at trial is noteworthy for it is similar to the testimony of the experts in the instant case.

tary intoxication may support insanity defense).

The central reason for prohibiting the assertion of mental conditions brought on by voluntary intoxication as a complete defense is that one who consumes alcohol or drugs should realize the possibility of potentially dangerous effects. Hasse, *Drug Intoxication and Criminal Responsibility: Old Dilemmas and a New Proposal,* 16 Santa Clara L. Rev. 249, 259 (1976). Thus, one whose consumption is not voluntary should not be denied the right to claim the defense of insanity. *State v. Mriglot, supra* at 575. Similarly, one whose consumption of alcohol or drugs is voluntary but who is unaware of some atypical effect which such consumption may have upon him or her should be permitted to claim the defense. *See, e.g., People v. Murray,* 247 Cal. App. 2d 730, 732, 56 Cal. Rptr. 21 (1967) (dictum) (intoxication involuntary if defendant was unaware of combined effects of drugs and alcohol); Comment, *Pathological Intoxication and the Voluntarily Intoxicated Criminal Offender,* 1969 Utah L. Rev. 419, 426–28 (complete defense should be allowed for person having "grossly excessive" reaction of which he or she was previously unaware). In particular, one whose underlying insanity is triggered by consumption of alcohol or drugs and who is previously unaware of the triggering effect may claim that he or she is legally insane.

In the instant case, instructions to this effect should have been given, *i.e.,* the standard legal insanity instruction accompanied by an instruction that the defense must be rejected if the defendant knew or should have known of the atypical effect alcohol or drugs might have upon him. Both the portions of the record cited by the majority and those cited by Justice Dore in his dissent demonstrate that there was sufficient evidence from which the jury might have concluded: (1) that the defendant did not understand the nature and quality of his acts; and (2) that this was caused by an underlying mental illness triggered by intoxication.[3]

---

[3]Taken in context, the testimony of Dr. Pidgeon which the majority quotes at

The only remaining question, not addressed by either the majority or Justice Dore, is whether there was sufficient evidence from which the jury might conclude that the defendant was previously unaware of such an interaction. I believe that such evidence, albeit weak, did exist and the jury should have been allowed to consider and then either accept or reject it. While there was some testimony by the defendant's mother about previous extreme reactions to alcohol and drugs and some evidence that previous alcohol and drug use had necessitated institutionalization, the defendant himself testified as follows:

Q Has it ever been your intention to hurt anyone during any seizure or during a period of extreme intoxication?
A *Not that I know of,* no.
Q Does the consumption of alcohol have any unusual effect upon you, or do you know?
A *I don't really know* other than what I have been told. I get real sick. I do get real sick, like I was sick the first couple days up in jail.
Q Have you ever taken drugs along with alcohol?
A Yes.
Q What kind?
A Well, all different types. I have smoked hash with alcohol; I have smoked pot with alcohol; I have taken amphetamines with alcohol; speed with alcohol; I have taken downers with alcohol.
Q How does that seem to affect the normal intoxication that you would get from taking alcohol?
A It speedens it up.

(Italics mine.) Report of Proceedings, at 337–38.

The jury should have been instructed on the insanity defense with appropriate limiting instructions. Since it was not, the case should be remanded for a new trial.

DORE, J., concurs with UTTER, J.

---

page 625 is equivocal. He testified that the defendant has an underlying condition called "chronic undifferentiated schizophrenia" which could be made worse by "speed" or alcohol. The doctor also testified that his most recent exposure to alcohol and drugs produced a "toxic psychosis" which was the immediate cause of legal insanity. Whether he considered this "toxic psychosis" a worsening of the defendant's schizophrenia, the doctor did not make clear.

DORE, J. (dissenting)—The defendant, John Wicks, having been convicted and sentenced on three counts of assault, asserts he didn't have a fair trial because his primary defense of insanity was withdrawn from jury consideration. I agree and would reverse.

The trial judge ruled, as *a matter of law,* that Wicks was not insane at the time of the commission of the crimes; and alternatively, if he was insane, it was induced by voluntary drunkenness, which is not a defense.

The evidence concerning the defendant's drinking superimposed upon a preexisting mental disorder is similar to the record presented to this court in *State v. Brooks,* 97 Wn.2d 873, 651 P.2d 217 (1982). While *Brooks* involved a premeditation issue, the principles and rationale of that case are useful in the context of the present case.

In *Brooks,* a defendant convicted of first degree murder appealed from the judgment and sentence, contending it was error for the trial court to refuse to give his proposed instruction on involuntary intoxication and to refuse to admit the opinion testimony of a defense psychologist regarding premeditation. There was evidence at trial as to the defendant's intoxicated condition at the time of the victim's death, and the psychologist had sought to testify as to the defendant's ability to premeditate the intent to kill while in such a state. The trial court rejected the defendant's proposed instruction on involuntary intoxication, stating that there was no evidence that consumption of alcohol affected the defendant's ability to form an intent to kill and that intoxication had no bearing on premeditation.

This court held it was error for the trial court to refuse the instruction and to exclude the psychologist's testimony. Noting that specific intent and premeditation are separable and distinct mental states—the latter involving the mental process of thinking beforehand, deliberation, reflection, and reasoning over a period of time—the court concluded there was sufficient evidence to permit the jury to consider whether the amount of alcohol consumed had an effect on the defendant's ability to premeditate. The court further

stated that, because premeditation is a *mental state,* the proffered testimony of the psychologist, including his opinion as to the defendant's *mental state,* was relevant to the issue of the defendant's ability to premeditate, and should have been admitted.

Justice Stafford, speaking for a unanimous court, concluded his opinion in *Brooks,* stating at page 879:

> In the instant case there was considerable lay and medical testimony which, if believed by the jury, would establish that the *excessive drinking* superimposed upon defendant's *mental* disorder would interfere with his ability to premeditate. The trial court erred by rejecting this relevant testimony.

(Italics mine.)

In *State v. Huey,* 14 Wn.2d 387, 395–96, 128 P.2d 314 (1942), this court sets forth the standards when the affirmative defense of insanity can be given against the background of voluntary inducement of intoxication:

> In *State v. Kidwell,* 62 W. Va. 466, 59 S. E. 494, the court quoted from *State v. Robinson,* 20 W. Va. 713, 43 Am. Rep. 799, as follows:
>
> "'In general, insanity is an excuse for the commission of every crime because the party has not the possession of that reason which includes responsibility. An exception is when the crime is committed by a party while in a fit of intoxication, the law not permitting a man to avail himself of the excuse of his own gross vice and misconduct to shelter himself from the legal consequences of such crime.'"
>
> The distinction is further brought out in the cited case by a quotation from *Beck v. State,* 76 Ga. 452, as follows:
>
> "'If the drunkenness produced a temporary frenzy, madness or unsoundness of mind in the accused, he would not be excused or held irresponsible for the act done by him while laboring under such temporary insanity, madness or unsoundness of mind thus produced, it being his own voluntary act. *But if the mania, insanity or unsoundness of mind, though produced by drunkenness, be permanent and fixed, so as to destroy all knowledge of right and wrong, then the person thus laboring under these infirmities would not be responsible.*'"

(Italics mine.)

The testimony of Katherine Bailey, the prosecution's chief witness and a victim of the defendant's assault, constitutes substantial evidence as to defendant's insanity. Bailey testified that the defendant suddenly without warning fired his gun into the air. When she asked him why he did that, the defendant said, "To make him run". Report of Proceedings, at 30. She related how the defendant's brother Mike then apologized to her for the way John acted, saying he didn't usually act this way. She testified she didn't think the defendant knew what he was doing. She thought he was under the influence of alcohol "in addition to *something else*". (Italics mine.) She related she wasn't fearful of the defendant, as she didn't think he knew what he was doing. Report of Proceedings, at 36.

On a key question, Bailey related, "Yes. He seemed more unnaturally disoriented than a drunk, you know. He wasn't just drunk. *It was like he did not know what he was doing. He was disoriented.*"[4] (Italics mine.) Report of Proceed-

---

[4]Additional testimony of Katherine Bailey follows:

Q. And then what happened?

A. His brother came running out of the bank and tried to make him stop and they were wrestling around at the window of the truck. His brother tried to pull him back. His brother was apologizing to me for the way he acted because he said that he didn't usually act like that. I told him it was all right, just to take the gun and his brother and leave. And then Fred came back in the pickup and they ran off.

. . .

Q. Did he appear to you to know what he was doing?

A. No.

Q. Why do you say that?

A. Because I noticed him and his brother when we first got there they were acting very strange, very disoriented like they were high.

Q. Could you tell or do you have any opinion as to whether he was under the influence of alcohol?

A. I think he was *in addition to something else.*

Q. What makes you say that?

A. The way he was acting.

Q. During the period of time that you saw him, was he stumbling or swaying or anything of that nature?

A. Yes, it looked like they were staggering around when they first got there and started bumping up against each other like they didn't know where

ings, at 43.
Dr. Wayne McKay Pidgeon, a psychiatrist, examined

---

they were or what they were going to do.

Q. Was his speech understandable and coherent?

A. Yes.

. . .

Q. I believe you told me, in fact you did tell me then, did you not, as I have understood you to say here today, that you were not fearful of being shot when the gun was pointed at you?

A. No.

Q. You just didn't think he intended to do that, is that right?

A. That's right.

Q. And I believe you did say then and I believe you said here today you didn't think he knew what he was doing?

A. That's correct.

Q. At that time, isn't it a fact that you said that it looked like he just felt all was lost because he had shot off the gun?

A. Um–hum.

Q. As if maybe he didn't really intend to do that, is that a possibility?

A. Yes, it's a possibility. There's a lot of possibilities, you know. I don't think that he was in complete control of himself at the time of what happened and it snowballed. That was the impression I got.

. . .

Q. Did not give you any reason why he was pulling on you?

A. Well, I got the impression he wanted me to go with him.

Q. You're smiling a little bit and I'm wondering, did you also get the impression maybe he was attracted to you rather than tending to hurt you?

A. Yes, I did.

. . .

Q. And that he didn't know what he was doing?

A. Yes, right.

Q. You didn't think he did?

A. I didn't think he did.

. . .

Q. I thought you just said on cross–examination you weren't fearful of being shot?

A. I didn't think he was going to shoot but, of course, I was scared. But if somebody asked me if I thought he was going to shoot me or not, I would say no. But I was afraid anyway because he had a gun pointed in my face, you know. If he was going to shoot somebody he could have shot Fred instead of shooting up in the air.

. . .

Q. So on a relative scale he fits somewhere in between then, is that correct?

A. Yes. He seemed more unnaturally disoriented than a drunk, you know. He wasn't just drunk. It was like he did not know what he was doing. He was disoriented.

Q. Did it appear to you that he knew what he was doing when he was pointing

Wicks on March 23, 1977, and a second time on October 2, 1978, at the request of the State. He testified Wicks had a history of psychomotor epilepsy dating back to an old head injury, and had been in and out of the state hospital in Oregon 18 to 20 times. The doctor then testified as to Wicks' long history of drug and alcohol abuse, for which he had been treated repeatedly. Report of Proceedings, at 206–07.

After a long hypothetical question, Dr. Pidgeon was asked:

Q. . . . Now for my questions, Doctor, based upon those facts, based upon reasonable recent medical probability, Doctor, do you have an opinion as to whether at the time of the alleged acts of assault of which John Wicks is charged with committing on August 28, 1978, whether he was legally sane?

A. Yes.

Q. What is that opinion?

A. My opinion was that he was insane. He was not sane.

Q. In your opinion, did he understand the nature and quality of his acts?

A. He did not, in my opinion.

. . .

Q. A second question to you, Doctor, would be do you have an opinion based upon reasonable medical probability whether on the afternoon of August 28, 1978 John Wicks had the particular mental state required to have the specific intent to injure others with a firearm.

A. Yes, I have an opinion.

Q. What is that opinion?

A. That he did not have the intent to harm other people.

Report of Proceedings, at 218–19.

Dr. Pidgeon testified that Wicks was a chronic schizophrenic, whether or not he used alcohol or drugs. Report of

---

the gun at Fred?

A. When he was running away it was almost like he was playing a game, you know, when he was doing that. It was just like—I didn't think he was going to shoot him. It was just like he was aiming at him for drill or something, just to follow through with whatever he had started.

(Italics mine.) Report of Proceedings, at 35–44.

Proceedings, at 228–29.

Excerpts from Wicks' medical records of the Mental Health Division of Dammasch State Hospital (Dammasch) at Wilsonville, Oregon, in themselves are also substantive evidence of the defendant's insanity. They are also corroborative of the testimony of Bailey and the defense witnesses. The following excerpts are illustrative of his many confinements over a period of 15 years:

> 5/13/66 DISCHARGE SUMMARY. This 17–year–old single white male was admitted to Dammasch Hospital for the third time on a voluntary basis. He had come under the jurisdiction of the Juvenile Court for robbing a store in the Lloyd Center with a toy pistol. He was released to his mother on condition that she would have him placed in Dammasch Hospital. John has always been a behavioral problem. He has been diagnosed as a brain damage syndrome with hyperactivity, low frustration tolerance. This is shown in a poor performance at school and a proclivity for antisocial behavior which included stealing to obtain money for cigarettes, glue sniffing, beer drinking and heedlessness at home. He was released from his second admission to this hospital in September 1965. Since then, he received special education in the Creston Grade School and he was given a job as a custodian. He was expelled from this school one month prior to admission after he stole a case of beer, got drunk and smashed the window of a police car.
>
> Diagnosis: Chronic brain syndrome of unknown cause with mental deficiency, mild and behavioral reaction.

Dammasch records, at 25.

> 8/3/67 DISCHARGE SUMMARY: This 18 year old single white male was readmitted to Dammasch State Hospital as a voluntary patient on 6–1–67, because of violent and assaultive behavior at home.
>
> On admission the patient was quite high. He expressed the feeling of restlessness and wishes to kill people. He calmed down after admission to the ward and he was given a job, helping to put elderly patients to bed.

Dammasch records, at 2.

> 6/15/77 GENERAL IMPRESSIONS OF PROFILE: Type of disorder: Mixed—Anxiety neurosis in schizoid personality

with somatization. Severity of Disorder: Severe.
Dammasch records, at 5.

10-29-77 FINAL DIAGNOSIS: Manic depressive illness manic type, episodic excessive drinking, seizure disorder.
Dammasch records, at 8.

2-10-78 FINAL DIAGNOSIS: Cyclothymic personality; Episodic excessive drinking; Psychomotor seizures.
Dammasch records, at 9.

7-14-78 ADMITTING DIAGNOSIS: Acute alcohol intoxication. Habitual excessive drinking.
Dammasch records, at 1.

Testimony of the defendant's mother, Rosemary Gurske, again was substantial evidence as to the defendant's insanity. She related that when the defendant was only 14 months of age, he received head injuries which required over 100 stitches to repair. At the time, he lost all coordination and speech. He was unconscious for a period of time and sustained *extensive brain damage.* As a result of this injury he couldn't walk and he had no bowel or urine control. She related how she sent him to Pioneer School because he had mental problems. He was then sent to Creston School where he attended a class for the retarded. In the eighth grade, he was sent to the Mental Health Division at Dammasch State Hospital. Later he was sent to a mental hospital in Hastings, Minnesota. Subsequently he was sent to an institution for the criminally insane in Yankton, South Dakota. Wicks' mother testified further that during this time period he suffered from psychomotor epileptic seizures. Report of Proceedings, at 286-90.

She related an incident when his sister called him a kid and he grabbed her by the throat, and she slipped into unconsciousness. Later, he didn't even know where he was. She also described another incident when she suggested he take his medicine, he grabbed her and choked her into unconsciousness. Report of Proceedings, at 290.

When the defendant's mother was asked, "Has John ever had any difficulty knowing right from wrong," she

responded:

> Well, I don't know, he just can't seem to distinguish a lot of times between right from wrong. And like he will work and he will get a paycheck and he knows he will need a pair of shoes or something but he will just go out and he gives his money away.

Report of Proceedings, at 291–92.

She related that he went to California in 1972 and was shot six times, with three of the bullets in his head with several fragments in his left temple. They could not be removed because they were pressing on vital nerves. As a result, he is blinded in one eye and has blackouts. After he was shot in the head, his condition worsened and at times he has difficulty recognizing his brother and sisters. Report of Proceedings, at 293. He attempted suicide four or five times by means of excessive drugs and by cutting his wrists. Report of Proceedings, at 298.

Mrs. Gurske stated her son has been confined to Dammasch Mental Hospital 14 times. Some of the times he has been committed were when he was using alcohol and/or drugs; there were times, however, when he wasn't. When he choked his sister into unconsciousness, he hadn't been drinking. Report of Proceedings, at 299–300.

Mike Wicks testified as to John's condition the morning of the credit union event. Mike stated John rambled in his speech, but he couldn't understand what he was saying. When he was asked about John's eyes, he responded: "They were kind of glazed . . . It's just—he was like a person that *lost their mind* would be the best way to explain it, is the way, you know, it looked when you looked at him, especially in the eyes. They were just glazed and stuff . . . I wanted to keep him right by me for that main purpose alone because there's no telling what he could do. He could go out in the middle of the road and lay down." Report of Proceedings, at 320.

Mike testified that when he heard the shot he ran to John and grabbed him. He related:

He was standing there all wild–eyed and stuff and I knew he didn't know what he was doing or even where he was and, you know, if I would have just left him there he would have just sat down and went to sleep probably so I grabbed him and took him with me. . . .

Q. And what did you do then after the shot was fired?

A. I got over to John as quick as I could because I knew he wasn't in his right mind and I didn't want to see him hurt himself or anyone else.

Report of Proceedings, at 322–23.

## CONCLUSION

The Court of Appeals, in denying Wicks' appeal, concluded that even if the jury should believe all of the evidence favorable to defendant's plea of insanity, there was insufficient evidence to support a verdict of not guilty by reason of insanity. This is incorrect. If a jury found Wicks not guilty by reason of insanity, no appeal is permitted under our constitution and there would be no need for the appellate courts to determine there was "sufficient evidence to support a verdict of not guilty by reason of insanity".

The cumulative testimony of the victim, Katherine Bailey; the defendant's mother, Rosemary Gurske; Mike Wicks; Dr. Wayne McKay Pidgeon, and the medical records of the Mental Health Division of Dammasch State Hospital constitute a mountain of powerful and substantial evidence that defendant Wicks, at the time of the credit union event, couldn't distinguish between right and wrong and was temporarily insane. This issue of "insanity" was factual and should have been submitted to the jury, not ruled on by the judge as a matter of law. The issue of "intoxication" had been rejected by the jury. There is no other explanation for the defendant's actions except temporary insanity. The defendant had a constitutional right to have his fate decided by a jury, not the judge. *State v. Brooks,* 97 Wn.2d 873, 651 P.2d 217 (1982).

I would reverse and remand for a new trial.