IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 29284-3-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JUSTIN W. CRENSHAW, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

BROWN, J. — Justin W. Crenshaw appeals his two aggravated first degree murder

convictions for the deaths of Sarah A. Clark and Tanner E. Pehl. Mr. Crenshaw's

diminished capacity defense was that he lacked the mens rea necessary for aggravated

first degree murder because he suffers from pathological intoxication, a condition where

a person has a grossly excessive reaction to alcohol. Mr. Crenshaw contends he was

denied effective assistance of counsel because his attorney did not pursue further

pathological intoxication testing and his attorney was conflicted because he was running

for Spokane County Prosecutor at the time of his representation. We disagree for the

reasons explained below, and affirm.

FACTS

On February 28, 2008, Mr. Crenshaw killed Ms. Clark, his 18-year-old girl friend,

and Mr. Pehl, his 20-year-old coworker. The deceased were found in a house

intentionally set on fire. Firefighters found Mr. Pehl in a pool of blood with a large broadsword protruding from his chest. Firefighters found Ms. Clark with a Samurai sword through her neck. Both had been stabbed repeatedly with a small knife.

The State charged Mr. Crenshaw with two counts of aggravated first degree murder. Mr. Crenshaw consumed "a large amount" of alcohol on the night of the crimes; experts estimated his blood alcohol level at .30. Report of Proceedings (RP) (July 21, 2010) at 2269. Mr. Crenshaw claimed diminished capacity, arguing he lacked the capacity to form the intent necessary for aggravated first degree murder based on pathological intoxication (also referred to as alcohol idiosyncratic reaction). At a pretrial hearing, testimony revealed Mr. Crenshaw had told police officers he got aggressive and violent when he drank.

At the January 7, 2010 status conference, counsel advised the court he was consulting with an expert regarding a pathological intoxication defense and the expert had "suggested and required as part of his . . . opinion . . . . that there be further testing." RP (Jan. 7, 2010) at 284-85. The expert had suggested testing was "absolutely necessary" to completely formulate the defense, so a continuance of the trial was necessary. *Id.* at 287. Mr. Crenshaw personally objected to the continuance, but the court continued the trial to facilitate preparation of the defense.

At the February 22, 2010 status conference, counsel advised he had an agency available to conduct the suggested testing, yet he was having trouble satisfying the jail's transportation concerns.

At the April 9, 2010 status conference, counsel advised the court that the primary reason for the continuances had been accomplished, but there was still some analysis that needed to occur. It was noted that an agreement with the University of Washington to facilitate the testing could not be reached. Counsel advised the court that he had explained that fact to Mr. Crenshaw. Thereafter, Mr. Crenshaw advised that he believed his speedy trial rights had been violated by the continuances to facilitate a testing that was not completed. The court noted Mr. Crenshaw's objection, then advised that the case could go to trial immediately if Mr. Crenshaw decided to forego his diminished capacity defense. The court noted the proposed test had not yet been shown to be admissible pursuant to the *Frye*[1] test. The court advised Mr. Crenshaw that his counsel was a very experienced criminal defense attorney who knows that a diminished capacity defense triggers the State's opportunity to have their own expert and testing.

On April 23, 2010, counsel advised the court he still had not received a report from his expert, Dr. Jerry K. Larsen (a forensic psychiatrist), but was not in a position to ask for a continuance due to Mr. Crenshaw's objection. Counsel advised he was not prepared for trial knowing that there might be additional evidence developed during testing of Mr. Crenshaw by the State's expert. Mr. Crenshaw advised the court about his testing delays and concerns. The court advised Mr. Crenshaw that trial was set to start on May 3. Mr. Crenshaw acknowledged that more testing needed to be done, but

---

[1] *See Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923) (standard for admitting novel scientific theory or principle is whether it has achieved general acceptance in the relevant scientific community).

3

he was not willing to give more time to complete the test. The court continued the trial over Mr. Crenshaw's objection.

Counsel notified the court on May 10, 2010, that he had received the report from his expert, Dr. Larsen, indicating Mr. Crenshaw may suffer from pathological intoxication. Psychiatrist, William Grant, then assessed Mr. Crenshaw for the State.

At a June 8, 2010 status conference, defense counsel brought up the issue of further testing and requested an in camera hearing to address funding for the test. Counsel explained the testing would involve taking Mr. Crenshaw out of jail, transporting him to a hospital that would agree to host the test, and then giving him alcohol while Dr. Larsen would observe Mr. Crenshaw's reaction. While Dr. Larsen was willing to perform the test, counsel acknowledged it was difficult to find a willing hospital. Counsel informed the court he asked Dr. Larsen whether the test would alter his opinion, to which the doctor responded that the test would not "substantially impact his opinion." RP (June 8, 2010) at 2623. Counsel reasoned Dr. Larsen had already reached an opinion based on observable facts and circumstances from the record that Mr. Crenshaw's capacity to commit the crimes was diminished. Counsel explained: "I have come to my own conclusions based on my experience and my training that that testing would not further Mr. Crenshaw's defense and has the potential to hurt it." RP (June 8, 2010) at 2623-24.

The court reiterated its concern that the subject test would not pass the *Frye* test since no facility had been found that was willing to conduct the test. Finally, the court observed that the evidence would have to be compelling for the court to even consider

4

allowing the defendant to be taken out of jail for any testing. Nevertheless, the court advised that it would not foreclose counsel from pursuing the testing; provided, the court was presented with evidence that the test is relevant and would pass the *Frye* prerequisites.

At the June 8, 2010 hearing, Mr. Crenshaw advised the court his attorney was running for prosecutor. The court inquired whether Mr. Crenshaw was making a motion. Mr. Crenshaw responded, "I'm not sure if I'm prepared at this time for a motion." RP (June 8, 2010) at 2619. The issue was not raised again.

In July 2010, the case proceeded to trial without further testing. The court found Dr. Larsen's evaluation and diagnosis satisfied the *Frye* test and that he would be permitted to offer his diagnosis. Dr. Larsen testified he spent a "significant amount of time looking at [Mr. Crenshaw's] use of alcohol" and tendency for violence when drinking. RP (July 21, 2010) at 2255-57. He opined Mr. Crenshaw may suffer from pathological intoxication. Dr. Larsen made this assessment based on Mr. Crenshaw's "history . . . his own report and the amount of alcohol he reports ingesting." RP (July 21, 2010) at 2269. On cross examination, the State pointed out pathological intoxication is the extreme reaction to a small amount of alcohol and Mr. Crenshaw admitted consuming a large amount. Dr. Larson responded without a controlled study, he could not make a "firm diagnosis." RP (July 21, 2010) at 2301.

The State's expert, Dr. Grant, opined Mr. Crenshaw suffered from alcohol dependency but that condition did not negate Mr. Crenshaw's intent. To support his opinion, Dr. Grant pointed to "the force that was used to strike the death blows," the

5

location of the wounds, the fact Mr. Crenshaw had to "overcome resistance," the multiple wounds which shows "repetitious behavior" and "the arson in an attempt to cover up the crime." RP (July 22, 2010) at 2330.

The jury found Mr. Crenshaw guilty as charged. He appealed.

## ANALYSIS

The issue is whether Mr. Crenshaw was denied effective assistance of counsel. He contends counsel was ineffective for failing to demand additional pathological intoxication testing and was conflicted by running for county prosecutor at the time of representation.

In order to prevail on these claims, Mr. Crenshaw must show counsel's performance was deficient and that this deficiency prejudiced him. *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). Performance is deficient when it falls "below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Performance is not deficient if counsel's conduct can be characterized as a legitimate trial strategy. *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). The fundamental question is whether defense counsel's conduct so undermined the adversarial process that the trial cannot be relied on as having a just result. *Strickland*, 466 U.S. at 686.

Diminished capacity is an affirmative defense that can negate the specific intent or knowledge elements of a crime. *State v. Eakins*, 127 Wn.2d 490, 496, 902 P.2d 1236 (1995). "Diminished capacity arises out of a mental disorder, usually not amounting to insanity that is demonstrated to have a specific effect on one's capacity to

6

achieve the level of culpability required for a given crime." *State v. Gough*, 53 Wn. App. 619, 622, 768 P.2d 1028 (1989). A trial court may admit evidence of the defendant's diminished capacity "only if it tends logically and by reasonable inference to prove that a defendant was incapable of having the required level of culpability." *Gough*, 53 Wn. App. at 622. Additionally, "[t]o maintain a diminished capacity defense, a defendant must produce expert testimony demonstrating that a mental disorder, not amounting to insanity, impaired the defendant's ability to form the culpable mental state to commit the crime charged." *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001).

The sole case in our state where pathological intoxication is addressed is *State v. Wicks*, 98 Wn.2d 620, 627, 657 P.2d 781 (1983). There, our Supreme Court held, "[O]ne whose consumption of alcohol or drugs is voluntary but who is unaware of some atypical effect which such consumption may have upon him or her should be permitted to claim the defense." *Pathological Intoxication and the Voluntarily Intoxicated Criminal Offender*, 1969 Utah L. Rev. 419, 426-28 (complete defense should be allowed for person having "grossly excessive" reaction of which he or she was previously unaware). Pathological intoxication is intoxication that is:

> self-induced in the sense that the defendant knew what substance he was taking, but which was 'grossly excessive in degree, given the amount of the intoxication.' . . . [T]he intoxication is involuntary only if the defendant was unaware that he is susceptible to an atypical reaction to the substance taken.

2 LaFave Substantive Criminal Law (2d ed), § 9.5(g), at 56 (quoting Model Penal Code § 2.08(5)).

7

Defense attorneys have a responsibility to be advocates for their clients and to explore viable defenses. *State v. Gonzales*, 111 Wn. App. 276, 45 P.3d 205 (2002). Here, counsel chose to pursue a novel defense and located an expert to support his argument. Considering his assessment that further testing potentially could "hurt" his diminished capacity defense, counsel's decision not to seek additional pathological intoxication testing can be characterized as a legitimate strategy and trial tactic and, thus, cannot be the basis for Mr. Crenshaw's ineffective assistance of counsel claim. RP (June 8, 2010) at 2624. Mr. Crenshaw expressed on the record his desire that the case go forward and that no further continuances be granted. Dr. Larsen provided a detailed report and was willing and prepared to testify Mr. Crenshaw suffered from pathological intoxication. Further, counsel could not locate a facility to allow the novel testing, and jail personnel expressed grave concerns about transportation. Given all, counsel made a sound tactical decision not to pursue more testing in support of his trial strategy. Counsel's conduct did not so undermine the adversarial process that the trial cannot be relied on as having a just result. *Strickland*, 466 U.S. at 686.

Even assuming counsel's decision was deficient, Mr. Crenshaw fails to establish prejudice. Dr. Larsen testified to the condition and Dr. Grant rebutted it. We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Baker*, 162 Wn. App. 468, 473, 259 P.3d 270 (2011). Even if Dr. Larsen testified with complete certainty of the condition, it would still be subject to rebuttal by the State. Thus, Mr. Crenshaw cannot show the outcome would have been any different with additional testing.

Turning to Mr. Crenshaw's conflict argument, under Washington's Rule of Professional Conduct (RPC) 1.7(a)(2), "A lawyer shall not represent a client if the representation . . . will be materially limited . . . by a personal interest of the lawyer." The Sixth Amendment right to counsel includes the right to conflict-free counsel. *State v. Davis*, 141 Wn.2d 798, 860, 10 P.3d 977 (2000) (citing *Wood v. Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981)). To establish a Sixth Amendment violation, a defendant must demonstrate that an actual conflict of interest adversely affected his attorney's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). Prejudice is presumed if the defendant makes this showing. *Id.* at 349-50. A trial court must inquire if it knows or reasonably should know that a particular conflict exists. *Id.* at 346. But even if the trial court fails to inquire, the defendant must still establish that the conflict of interest adversely affected his counsel's performance. *Mickens v. Taylor*, 535 U.S. 162, 173-74, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002).

In *Price v. State*, 66 S.W.3d 653 (Ark. 2002), the Arkansas Supreme Court rejected the appellant's argument that his defense counsel had a conflict of interest because counsel had won the prosecuting attorney's election approximately two weeks prior to the commencement of appellant's trial. In that case, the court set forth the *Cuylar* requirements for a conflict-of-interest argument and held that the appellant failed to apprise the court of the nature of the conflict; failed to show that his counsel actively represented conflicting interests; and even if such a conflict existed, failed to show that the conflict had a detrimental effect on his counsel's representation.

9

Here, Mr. Crenshaw mentioned that defense counsel was running for county prosecutor, but did not advise the court of the nature of the conflict and did not request additional action. He further failed to show that defense counsel was actively representing his own interest and failed to show that, even if there was a conflict, that it had a detrimental effect. Overwhelming evidence existed against Mr. Crenshaw. Counsel researched and pursued a novel defense to attempt to negate Mr. Crenshaw's murderous intent. The record shows Mr. Crenshaw's counsel zealously and skillfully represented him. Accordingly, we conclude Mr. Crenshaw was not denied effective assistance of counsel.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Brown, J.

WE CONCUR:

_____
Siddoway, A.C.J.

_____
Kulik, J.