# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

                Respondent,

       v.

MICHAEL SEAN THOMPSON,

                Appellant.

DIVISION ONE

No. 80602-5-I

PUBLISHED OPINION

DWYER, J. — Michael Thompson appeals from the judgment entered on a jury's verdict finding him guilty of murder in the second degree. He raises numerous claims of error, among them that (1) the trial court erred by excluding evidence of his insanity and (2) double jeopardy barred his second trial after his first trial ended in a mistrial. His first claim has merit, his second does not. Accordingly, we reverse the judgment and remand for further proceedings.

I

Michael Thompson suffers from severe mental illness and began using drugs regularly as a young teenager. In 2012, Thompson began living in an apartment at Kenyon House, a housing program run by Sound Mental Health for people who have been chronically homeless and suffer from both HIV (human immunodeficiency virus) or AIDS (acquired immunodeficiency syndrome) and chronic mental illness or substance abuse issues. In January 2014, Thompson

was sentenced on a conviction of taking a motor vehicle and was ordered to serve eight months on electronic home monitoring. Thompson was required to begin serving this sentence by May 19, 2014. On that day, Thompson attempted to set up electronic home monitoring at his apartment at Kenyon House but was unable to do so because the equipment provided was incompatible with the telephone line at his residence.

Thompson became depressed, believing that he would have to go to jail. He began drinking alcohol and using drugs and continued to do so around different areas of downtown Seattle for several days. Eventually, Thompson encountered an acquaintance, Daryl Ford. Ford and Thompson drank beer together and then went to Thompson's apartment and used drugs supplied by Ford.

At trial, Thompson testified that, in the apartment, Ford made sexual advances toward him over his verbal objections. According to Thompson's testimony, Ford then repeatedly attempted to sexually assault Thompson and prevented Thompson from leaving the apartment at knifepoint, telling Thompson, "You ain't smoking my shit for free." Ford was "slicing" at Thompson with the knife, Thompson testified, causing Thompson to retreat to a bathroom in which he hit his head against a towel rack, losing consciousness.

Upon awakening, Thompson found himself on the floor stabbing Ford's hand with the knife. Ford was dead. An autopsy later revealed that Ford had 87 injuries produced by a knife.

Thompson cleaned the apartment and removed the body. He did so by wrapping Ford's body in blankets, placing it in a shopping cart, and pushing it down the street. A neighbor saw him moving the cart, became suspicious, and called the police. Police officers discovered the body and found Thompson's fingerprints on the cart.

Thompson was arrested at his wife's home in south King County.[1] He was charged with murder in the second degree for causing the death of Ford while committing a felony (assault) while armed with a deadly weapon. The information was later amended to add an alternative count of intentional murder in the second degree while armed with a deadly weapon.

Thompson's first trial took place in 2017. After 14 days, the judge declared a mistrial because the prosecutor asked Thompson several questions regarding why he had not told detectives about Ford's attempted assault, causing him to explain several times that he had invoked his right to silence.

Thompson was tried again in 2019 with new defense counsel. He was convicted of felony murder while armed with a deadly weapon.

Thompson appeals.

II

Thompson contends that the trial court erred by denying him the right to advance the defense of insanity. We regard Thompson's challenge as one to the

---

[1] Thompson had been living separately from his wife and young children because of his serious mental health and substance abuse issues.

trial court's evidentiary ruling, which excluded any evidence of insanity,[2] and we agree.

According to Thompson, the trial court's ruling violated his "right to present a defense." Our Supreme Court has explained that a contention that an evidentiary ruling violated a defendant's constitutional "right to present a defense" is reviewed pursuant to a two-step process. State v. Arndt, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019). First, we review the challenged evidentiary ruling under an abuse of discretion standard. Then, if necessary, we review de novo whether the ruling violated the defendant's constitutional right to present a defense. See Arndt, 194 Wn.2d at 797-98.

A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or for untenable reasons, such as a misunderstanding of the law. State v. Enriquez-Martinez, ___ Wn.2d ___, 492 P.3d 162, 164 (2021).

Insanity is a defense that completely absolves a defendant of criminal liability. State v. Crenshaw, 98 Wn.2d 789, 793, 659 P.2d 488 (1983). It is available only to "those persons who have lost contact with reality so completely that they are beyond any of the influences of the criminal law." State v. White, 60 Wn.2d 551, 590, 374 P.2d 942 (1962). Insanity is an affirmative defense that the defendant must establish by a preponderance of the evidence. RCW 10.77.030(2); State v. Box, 109 Wn.2d 320, 322, 745 P.2d 23 (1987).

---

[2] As evidence of insanity was excluded, there was not evidence of insanity admitted that would have entitled Thompson to an insanity instruction. See State v. Fisher, 185 Wn.2d 836, 848, 374 P.3d 1185 (2016) (a defendant is entitled to have the jury instructed on any theory of the case that is supported by the evidence).

4

Additionally, "[b]ecause the law presumes that an individual is sane at the time that the individual commits a crime, a defendant asserting the insanity defense bears the initial burden of producing evidence of insanity." State v. Chanthabouly, 164 Wn. App. 104, 127-28, 262 P.3d 144 (2011) (citing Box, 109 Wn.2d at 322). To establish the defense of insanity, the defendant must show that

> (1) [a]t the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:
> (a) He or she was unable to perceive the nature and quality of the act with which he or she is charged; or
> (b) He or she was unable to tell right from wrong with reference to the particular act charged.

RCW 9A.12.010.

Further, "[n]o condition of mind proximately induced by the voluntary act of a person charged with a crime shall constitute insanity." RCW 10.77.030(3).

Prior to his second trial, Thompson requested that the jury be instructed on insanity and sought to present evidence, through expert testimony, that he suffered from mental illnesses—specifically posttraumatic stress disorder, depression, and a developmental disability—which "rendered him unable to perceive the nature and quality of his act" at the time of the offense. Thompson filed a declaration from psychiatrist Dr. Richard Adler, in which Dr. Adler stated:

> [M]y opinion is that Mr. Thompson was insane at the time of the incident. As a result of his mental disease: Major Depression with psychotic features, Post-traumatic Stress Disorder (PTSD), and Mild Neurocognitive Disorder due to multiple etiologies, the defendant's mind was affected to such an extent that he was unable to perceive the nature and quality of the acts with which the defendant is charged (intentional murder) and/or was unable to tell right from wrong with reference to the particular acts with which

5

defendant is charged – i.e., overwhelmingly paranoid and acting in self-defense. This mental state was aggravated by the consumption of drugs and alcohol.

With regard to Thompson's voluntary intoxication at the time of the offense, Thompson's counsel explained:

> We have opinions from our experts that say that by [the] preponderance of the evidence according to their reasonable medical certainty that Mr. Thompson was insane at the time, that he was unable to appreciate the nature, the consequences of what he was doing.
> . . . .
> Both experts say that they believe that Mr. Thompson's voluntary intoxication did not proximately induce his inability to perceive the nature and consequences of his actions. They believe that given his developmental disability; his PTSD based on longstanding, lifelong abuse, both physical and emotional; and then finally, his depression, that given the situation with Mr. Ford where Mr. Ford tries to sexually assault Mr. Thompson, they believe that in response to that, even without the intoxication, he would have responded in the same way. They do opine that Mr. Thompson's intoxication was a factor and that maybe it had some role in enhancing his paranoia at the time.

Nevertheless, the trial court excluded any reference to insanity because the expert witnesses were of the opinion that Thompson's mental state at the time of the offense was also impacted by his voluntary use of drugs and alcohol. In doing so, the trial court assumed that the term "condition of mind" refers to insanity, observing that "there can be multiple proximate causes" of a defendant's state of mind, and stating that

> RCW 10.77.030(3) talks about "No condition of mind proximately induced by the voluntary act of a person charged with a crime shall constitute insanity." Even taking the defense's experts—in looking at those reports in the light most favorable even to Mr. Thompson, the defense experts cannot preclude intoxication—voluntary intoxication, as a proximate cause of having induced—having been an inducement.

6

But insanity is not the "condition of mind" referenced in the statute.[3] Rather, insanity is a legal conclusion about a defendant's mental state that is appropriately made when a defendant's mind is so impaired by a "mental disease or defect" that the defendant is "unable to perceive the nature and quality of the act with which he or she is charged" or is "unable to tell right from wrong with reference to the particular act charged." See RCW 9A.12.010. Thus, "condition of mind" refers to the specific diagnosable condition testified to by the defendant's witnesses or the State's witnesses in rebuttal. When such a condition of mind arises involuntarily, it may amount to insanity. On the other hand, when such a condition of mind is proximately induced by a defendant's voluntary acts, that condition is excluded from those mental diseases or defects that may constitute insanity.

This meaning is apparent given the long history of the insanity defense in Washington. The insanity defense is rooted in the common law and, in Washington, predates statehood. See, e.g., McAllister v. Territory of Wash., 1 Wash. Terr. 360 (1872). In 1909, after the legislature enacted a statute eliminating the insanity defense, our Supreme Court invalidated that statute, explaining that

> the sanity of the accused, at the time of committing the act charged against him, has always been regarded as much a substantive fact, going to make up his guilt, as the fact of his physical commission of the act. It seems to us the law could as well exclude proof of any other substantive fact going to show his guilt or innocence. If he was insane at the time to the extent that he could not comprehend

---

[3] This is apparent from the language of RCW 10.77.030. If "condition of mind" meant "insanity," the statute would effectively state: "No [insanity] proximately induced by the voluntary act of a person charged with a crime shall constitute insanity." As such a reading contradicts itself, it is clearly not what the legislature intended.

> the nature and quality of the act—in other words, if he had no will to control the physical act of his physical body, how can it in truth be said that the act was his act? To take from the accused the opportunity to offer evidence tending to prove this fact, is, in our opinion, as much a violation of his constitutional right of trial by jury as to take from him the right to offer evidence before the jury tending to show that he did not physically commit the act or physically set in motion a train of events resulting in the act. The maxim "An act done by me against my will is not my act," may, without losing any of its force, be paraphrased to fit our present inquiry as follows: "An act done by me without my will, or in the absence of my will, is not my act."

State v. Strasburg, 60 Wash. 106, 119-20, 110 P. 1020 (1910).

Until the adoption of the Revised Code of Washington in 1950,[4] Rem. Rev. Stat. § 2173 provided:

> Any person who shall have committed a crime while insane, or in a condition of mental irresponsibility,[5] and in whom such insanity or mental irresponsibility continues to exist, shall be deemed criminally insane within the meaning of this act. *No condition of mind induced by the voluntary act of a person charged with a crime shall be deemed mental irresponsibility within the meaning of this act.*

(Emphasis added.)

In 1942, our Supreme Court, interpreting the statute cited above, held that a "mental irresponsibility" defense "can only be applicable to those cases where the condition of the mind results from *some cause other than* that of voluntary intoxication." State v. Huey, 14 Wn.2d 387, 394, 128 P.2d 314 (1942) (emphasis added).

In that case, the court explained that the defense is not available to an otherwise sane person who is voluntarily intoxicated:

---

[4] See Ch. 1.04 RCW.
[5] The terms "insanity" and "mental irresponsibility" have the same meaning. White, 60 Wn.2d at 586.

8

> "Voluntary intoxication does not excuse the commission of crime. A rule almost universally recognized and applied is that *a person who, being sane and responsible for his acts, voluntarily becomes intoxicated*, with or without a preconceived design to commit a crime, and while intoxicated, though it is to such a degree as to render him wholly oblivious to his acts or conduct, does any act which, if done by a person capable of distinguishing between right and wrong, would be criminal if not excused or justified in some way is responsible for his act, notwithstanding his mental condition at the time."

Huey, 14 Wn.2d at 395 (emphasis added) (quoting 15 AM. JUR. Criminal Law § 338, at 27 (1938)).

The Supreme Court then explained the purpose of the insanity defense and the voluntary intoxication exception:

> "In general, insanity is an excuse for the commission of every crime because the party has not the possession of that reason which includes responsibility. An exception is when the crime is committed by a party while in a fit of intoxication, the law not permitting a man to avail himself of the excuse of his own gross vice and misconduct to shelter himself from the legal consequences of such crime."

Huey, 14 Wn.2d at 396 (internal quotation marks omitted) (quoting State v. Kidwell, 62 W. Va. 466, 495, 59 S.E. 494 (1907)).

Accordingly, a defendant who was intoxicated during his offense and presented no medical testimony was not entitled to an insanity jury instruction, as the "condition of his mind" which limited his ability to distinguish right from wrong was "induced solely by voluntary intoxication." Huey, 14 Wn.2d at 396.

Over 40 years later, after the insanity defense had been codified in RCW 9A.12.010,[6] our Supreme Court addressed the intersection of voluntary

---

[6] The voluntary act exception was then codified as former RCW 10.77.010(7) (1983), which provided that "[n]o condition of mind proximately induced by the voluntary act of a person charged with a crime shall constitute 'insanity.'"

9

intoxication and insanity once again in State v. Wicks, 98 Wn.2d 620, 657 P.2d 781 (1983). The Wicks court concluded that a defendant with a history of mental illness who committed criminal acts while suffering from a condition called toxic psychosis—a severe mental disorder caused by voluntary use of alcohol or drugs—was not entitled to an insanity jury instruction. Wicks, 98 Wn.2d at 625-26. The Wicks court reasoned—as the Huey court had before it—that

> evidence of voluntary intoxication, *by itself,* is insufficient to justify an insanity instruction. This is so even if defendant although sane suffers from a preexisting mental illness. The voluntary use of intoxicants is the direct and immediate cause of insanity, not the preexisting mental illness.

Wicks, 98 Wn.2d at 622 (emphasis added) (footnote omitted).

This limitation exists to prevent the law from "'allow[ing] one to steel his nerves, blanket his conscience, and fortify his resolve by taking drugs in preparation for a criminal enterprise.'" Wicks, 98 Wn.2d at 623 (quoting State v. Bower, 73 Wn.2d 634, 646, 440 P.2d 167 (1968)).

Thus, for many decades, Washington courts have ruled that a condition that results from voluntary drug and alcohol is not evidence of insanity, even when the condition is a severe or unusual response to drug or alcohol use.[7] But no Washington court has held that a defendant may not present evidence of insanity—caused by an involuntary mental illness—simply because there is also evidence that voluntary drug or alcohol use impacted the defendant's mental state. If evidence is adduced that a defendant was impacted by an involuntary

---

[7] Although not applicable to this case, one exception to this rule exists. When long-term voluntary drug use produces a "permanent mental disease amounting to insanity," distinct from the temporary "mental excitement" of present intoxication, it may result in insanity. State v. Miller, 177 Wash. 442, 463, 32 P.2d 535 (1934). For example, delirium tremens is a condition that may constitute insanity. Wicks, 98 Wn.2d at 623.

mental condition that caused insanity and was also impacted by voluntary drug or alcohol use at the time of the offense, the evidence of insanity should be presented to the jury, and the jury should be instructed to consider whether the impact of the involuntary condition alone would have rendered the defendant insane.

Indeed, evidence of insanity has long been admitted and insanity defense instructions given in such cases. For example, in State v. Matthews, a jury rejected the defendant's insanity defense despite four experts testifying that he was insane at the time of the offense. 132 Wn. App. 936, 942, 135 P.3d 495 (2006). We explained that the jury was entitled to do so given other evidence in the record, including evidence that the defendant had voluntarily ingested cocaine, which supported an inference that Matthews was both sane and voluntarily intoxicated. Matthews, 132 Wn. App. at 938-42.

Similarly, in State v. Putzell, a jury considered whether a defendant who had both suffered a head injury and had consumed alcohol before shooting an acquaintance in a bar was insane at the time of the shooting. 40 Wn.2d 174, 175-76, 242 P.2d 180 (1952). The jury rejected the defense. Putzell, 40 Wn.2d at 175. Our Supreme Court explained that it was entitled to do so:

> Long and involved hypothetical questions were asked by counsel for both sides, each upon facts favorable to their own contention. The jury was not bound by the conclusions of the doctors in answer to these questions. The ultimate conclusion, and the ultimate decision as to the sanity or insanity of appellant, upon all of the evidence in the case, and the law, as given to it by the court, was the responsibility of the jury.

Putzell, 40 Wn.2d at 179.

11

In both cases, unrefuted evidence that each defendant had voluntarily used drugs or alcohol did not result in the exclusion of evidence advancing the insanity defense. Rather, in each case, the defendant presented evidence of insanity, the jury was instructed on insanity, and the jury made a determination as to the defendant's sanity.

Here, the trial court ruled based on its misunderstanding of the law. Accordingly, it abused its discretion by excluding Thompson's proffered evidence pertaining to the defense. Because the result of this error was that Thompson was not entitled to a jury instruction on the defense of insanity, which was his theory of the case, the error was not harmless.[8] Accordingly, we reverse and remand for a new trial.

III

Thompson also contends that subjecting him to retrial after his first trial ended in a mistrial violated his right to be free from double jeopardy under the Washington Constitution. This is so, he avers, because article I, section 9 of the Washington Constitution should be interpreted more broadly than its federal counterpart and, under this broader protection, retrial was impermissible. We disagree.

We review a double jeopardy claim de novo. State v. Strine, 176 Wn.2d 742, 751, 293 P.3d 1177 (2013). The double jeopardy clause of the United States Constitution guarantees that no person shall "be subject for the same

---

[8] "A harmless error is an error which is trivial, or formal, or merely academic, and was not prejudicial to the substantial rights of the party assigning it, and in no way affected the final outcome of the case." State v. Britton, 27 Wn.2d 336, 341, 178 P.2d 341 (1947).

offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. The double jeopardy clause of the Washington Constitution guarantees that "[n]o person shall . . . be twice put in jeopardy for the same offense." CONST. art. I, § 9. Our Supreme Court has held that "Washington's double jeopardy clause is essentially identical to its federal counterpart and thus affords no greater protection." State v. Benn, 161 Wn.2d 256, 261, 165 P.3d 1232 (2007); accord Strine, 176 Wn.2d at 751 ("'The federal and state [double jeopardy] provisions afford the same protections and are identical in thought, substance, and purpose.'" (alteration in original) (internal quotation marks omitted) (quoting State v. Ervin, 158 Wn.2d 746, 752, 147 P.3d 567 (2006))).

Double jeopardy generally does not bar retrial after a defendant moves for a mistrial. Oregon v. Kennedy, 456 U.S. 667, 672-73, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982). A narrow exception to this rule exists when a prosecutor intentionally "'goad[s]'" the defendant into moving for a mistrial. Kennedy, 456 U.S. at 676 (quoting United States v. Dinitz, 424 U.S. 600, 611, 96 S. Ct. 1075, 47 L. Ed. 2d 267 (1976)).

Notwithstanding authority to the contrary, Thompson urges us to hold that article I, section 9 offers broader protection than does the Fifth Amendment. He offers a Gunwall[9] analysis in an attempt to convince us that our Supreme Court has gone astray in its analysis of this issue. We find his entreaty uncompelling.

We are bound by the precedents of our Supreme Court. State v. Gore, 101 Wn.2d 481, 487, 681 P.2d 227 (1984). Given that our Supreme Court has

---

[9] State v. Gunwall, 106 Wn.2d 54, 720 P.2d 808 (1986).

previously explained that the Washington Constitution's double jeopardy clause does not offer broader protection than does its federal counterpart, we need not engage in a Gunwall analysis, as urged upon us by Thompson. It is of no significance that our Supreme Court has not addressed the specific contention articulated by Thompson in his briefing. Indeed,

> [i]f a court of appeals could disregard a decision of the Supreme Court by identifying, and accepting, one or another contention not expressly addressed by the Justices, the Court's decisions could be circumvented with ease. They would bind only judges too dim-witted to come up with a novel argument.

Nat'l Rifle Ass'n of Am., Inc. v. City of Chicago, 567 F.3d 856, 858 (7th Cir. 2009), reversed on other grounds by McDonald v. City of Chicago, 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010).

Here, the trial court found that the prosecutor did not intentionally cause a mistrial or act in bad faith. It also found that, notwithstanding the impropriety that necessitated the mistrial, the prosecutor's challenged line of questioning "probably seemed clearly appropriate" to her. Both findings well support the trial court's determination that the State did not intentionally provoke the mistrial.

Because Thompson did not establish that the prosecutor intentionally provoked the mistrial, double jeopardy did not bar retrial. Accordingly, Thompson's claim of error fails.[10]

---

[10] Given our disposition of the two issues addressed herein, it is unnecessary for us to address the other claims of error asserted in Thompson's briefing.

14

Reversed.

_Dwyer, J._

WE CONCUR:

_Chun, J._          _Mann, C.J._