IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37344-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EDUARDO S. MARTINEZ, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Twenty-three years after then-nearly-15-year-old Eduardo S.

Martinez is alleged to have raped his two young stepbrothers, and 20 years after the

youngsters' allegations came to light and were charged as crimes, Eduardo[1] was located

across the country. He waived extradition, returned to Benton County, and in a fourth

trial—following three mistrials—was convicted of the charges. He assigns error to what

he contends were (1) a violation of his constitutional right to a speedy trial, (2) the trial

---

[1] To avoid confusion given the number of parties and witnesses with the common paternal or maternal surnames, we refer to the members of those families by their first names. We intend no disrespect.

court's abuse of discretion in granting a motion for joinder of his prosecution with that of

his brother, (3) its abuse of discretion in declaring the third trial a mistrial, and (4) its

abuse of discretion in denying his motion for a new trial.

No constitutional speedy trial challenge was raised in the trial court, so the State

had no reason to fully develop its explanation for the delay in bringing Eduardo to trial.

In addition, disputes over responsibility for the delay will need to be resolved. Eduardo

must raise that challenge through a collateral attack.

We reject Eduardo's remaining challenges. In a contemporaneous appeal, the

panel grants relief to Eduardo's brother Alejandro for errors made at sentencing due to

changes in law from the time of the 1995 crimes. In the interest of sentencing

consistency, we grant the same relief to Eduardo. We affirm his convictions but remand

for resentencing.

FACTS AND PROCEDURAL BACKGROUND

In 1993, Urbina Martinez Miranda met and married Santiago P.V.[2] in Mexico.

Urbina had children from prior relationships, including the defendant, Eduardo S.

Martinez and his older brother Alejandro Ocampo Martinez. Santiago brought three

children of his own into the marriage who we will refer to pseudonymously as Emiliano,

---

[2] To protect the privacy of Santiago's sons we substitute pseudonyms for first names and initials for surnames. *See* Gen. Orders of Division III, *In re Use of Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App. June 18, 2012).

Julian, and Rodrigo. Soon after the marriage, the couple, Eduardo, and Santiago's sons immigrated to the United States and settled in Prosser. Alejandro was already living in the United States, having moved to Grandview in 1991.

For about a year, the family lived in a single wide trailer in a mobile home park on Highway 22. In the summer of 1995, Santiago purchased a recreational type trailer and located it in a trailer park behind the Burger King in Prosser (hereafter the "Prosser trailer park"). Members of the family other than Alejandro lived in the trailer. Alejandro continued to live in Grandview but occasionally stayed at the Prosser trailer.

That year, Urbina and Santiago separated several times. They eventually divorced. During one of the separations, Santiago moved with his three children to Grandview and the children enrolled at Whitstran Elementary. The two families never saw or heard from each other again.

Three years later allegations of sexual abuse to Julian and Emiliano came to light when a parent of a Whitstran student brought to the school's attention an explicit drawing that had circulated on the school bus. It bore Julian's name. Most prominent in the drawing was a depiction of a man having anal sex with a woman. The principal of Whitstran Elementary, Sarah Juzeler, met with fourth-grader Julian to discuss the drawing bearing his name.

Julian initially denied creating the drawing, but before long admitted authorship and disclosed he had been sexually abused three years earlier by his stepbrother Eduardo.

Principal Juzeler determined from school records that Julian and his brother Emiliano, a fifth-grader at the school, had lived in the Prosser trailer park in the fall of 1995. As a mandatory reporter, Principal Juzeler notified Child Protective Services (CPS) of what she had been told.

The allegation was referred to the Benton County Sheriff's Office and Detective Lee Cantu undertook the investigation in late September 1998. He and Mary Santoy, a sexual assault counselor, conducted interviews of Julian and Emiliano at Whitstran Elementary.

According to Detective Cantu, Julian told him that Eduardo had sexually abused him. He told the detective he believed Eduardo and Urbina still lived at the Prosser trailer park. The detective then spoke with Emiliano, who told the detective that both Eduardo and Alejandro had sexually abused him. Like Julian, Emiliano believed Eduardo and Urbina were still living at the Prosser trailer park.

Detective Cantu contacted the boys' father, Santiago, who disclaimed any knowledge of the abuse, which was never reported to him by either Emiliano or Julian. According to Detective Cantu, Santiago also told him that Eduardo was living at the Prosser trailer park, and told him he believed Alejandro was in New York.

On October 12, Detective Cantu went to the Prosser trailer park in hopes of finding Eduardo and Alejandro. He went to the manager's mobile home and knocked on the door, but no one answered. A handwritten sign in the window identified "Alejandro

Martinez" as the manager, and provided a telephone number, which the detective called. The individual who answered spoke English and identified himself as Alejandro Martinez. The detective told Alejandro that his name had been provided in connection with a case the nature of which he did not identify, and he would like to speak with him. Alejandro said he was at work and would not get off until 5 p.m., but he provided the name of the produce warehouse where he was working and Detective Cantu drove there to meet with him.

On arriving, the detective contacted the warehouse manager and asked if he had an employee by the name of Alejandro Martinez. The manager said no, but they did have an employee named Ricardo Martinez. The detective met with this employee who verbally identified himself as Alejandro Martinez but provided no identification. According to the detective, Alejandro said he was fluent in English and preferred to communicate with the detective in English. He waived his *Miranda*[3] rights. An advice of rights form that was later offered as evidence includes Alejandro's name, a date of birth, address, and phone number, handwritten by Detective Cantu. According to Detective Cantu, Alejandro affirmed that he still lived at the Prosser trailer park with Eduardo and his mother.

Detective Cantu asserts that, at the inception of the interview, he told Alejandro he was investigating an "incident" involving Emiliano and Julian that occurred in the fall of

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

1995 but did not specifically describe it as sexual abuse. Report of Proceedings (RP) (Trial)[4] at 630. Alejandro told the detective he remembered the incident but "it was very hard for him to talk about." RP (Trial) at 639. Alejandro then gave a written statement to the detective in Spanish, which translated to: "Me, Alejandro, did that with [Emiliano] one time," with no identification of what "that" was. RP (Trial) at 643.

Detective Cantu told Alejandro he would be charged with rape of a child in the first degree. He did not immediately book Alejandro due to overcrowding issues at the jail, however. According to the detective's notes of the interview, he spoke with Alejandro for a little over 40 minutes.

Three days later, the detective tried to contact Alejandro and Eduardo at the Prosser trailer park but found no one. Alejandro also did not answer calls to the phone number Detective Cantu had reached him at before. Detective Cantu forwarded information to the prosecutor that resulted in charges being filed. An information filed on November 2, 1998, charged Alejandro S. Martinez with one count of rape of a child (Emiliano) in the first degree under former RCW 9A.44.073 (1988). An information filed on December 14, 1998, charged Eduardo S. Martinez with two counts of rape of a child in the first degree under former RCW 9A.44.073 (1988), one addressed to the alleged rape of Emiliano and the other addressed to the alleged rape of Julian. A motion

---

[4] "RP (Trial)" refers to the three consecutively-paginated volumes reported by Cheryl Pelletier that include the final trial taking place in September and October 2019.

asking the juvenile court to decline jurisdiction of the charges against Eduardo was filed at the same time. Warrants were issued in 1998 for both brothers' arrest.

Detective Cantu would later testify at trial that the warrants issued "were placed in the system. The national system as well as the local [system]," but that he took no other steps to locate Alejandro or Eduardo. RP (Trial) at 650. He explained, "We had no, no location or . . . approximate location where they might have gone to . . . . Although New York state is not a large state, it's heavily populated [and] New York City's a heavily populated city. So we had no, no where [sic] to start." RP (Trial) at 650. The record does not reveal that any action was taken on the charges for over two decades.

*2018*

In the years that passed, Eduardo and Alejandro moved to Connecticut, worked, married, purchased homes, and started families. It appears that during this time frame, Alejandro consistently went by "Alex," not Alejandro, and often used his paternal surname Ocampo, with or without his maternal surname Martinez. (We refer to him hereafter as Alex, except when we describe the testimony of witnesses who referred to him as Alejandro.)

In November 2018, Eduardo was driving on a Connecticut highway when someone rear-ended him. The police responded to the accident and a check of Eduardo's identification documentation that he provided at their request turned up an outstanding arrest warrant for a Connecticut driving under the influence (DUI) charge from October

1997. According to Eduardo, he had failed to resolve that old charge because he had caused an accident at the time, and he became concerned that he might be jailed or even deported.

It was in connection with the continued prosecution of the old DUI charge that Connecticut police became aware of the outstanding Washington warrant and associated charges. The State obtained fugitive from justice warrants for Alex and Eduardo, who turned out to be living next to each other in a duplex in Bridgeport. Both were arrested a few weeks later.

Eduardo waived extradition and Detective Cantu traveled to Connecticut to transport him to Washington. He was arraigned on his charges on March 25, 2019.

Alex returned to Washington to surrender himself. He was arraigned on May 1, 2019. At arraignment, Alex's lawyer told the court that the State's charges were against Alejandro S. Martinez, which was incorrect, and that his client's name was Alex Ocampo Martinez. He also told the court that the State's birthdate for his client was also incorrect. The prosecutor responded that the State's position was that Alejandro had adopted a different name and date of birth after becoming aware of the molestation investigation and charges. The State has never changed its identifying information for Alejandro.

Eduardo's first trial on the charges began on May 13, 2019, shortly after Alex was arraigned. It ended in a mistrial on Eduardo's motion after Detective Cantu, called as a rebuttal witness, mentioned that Eduardo had invoked his right to counsel.[5]

On May 31, the State filed a motion to join its cases against Alex and Eduardo and consolidate them for trial. The motion was granted and a second trial, this time against both brothers, began on June 24. The second trial ended in a mistrial after the jurors informed the court they were deadlocked with no hope of reaching a verdict.

A third trial began on August 26. It ended in a mistrial on Alex's motion, after counsel for Eduardo was perceived by the trial court to have breached an in limine order. In response to the State's motion in limine that "all parties . . . be prohibited from mentioning at trial that the defendant has no prior criminal convictions or suggesting that he is a 'law abiding citizen,'" Clerk's Papers (CP) at 395, the trial court had ruled:

---

[5] The prosecutor questioned Detective Cantu about a couple of incriminating statements Eduardo allegedly volunteered on the drive to LaGuardia Airport. She was wrapping up when she asked the following question and received the following response:

Q. And the other information that he provided to you, was that in response to a specific question or was that small talk that he made during the course of the trip?
A. There was no questions asked of him. He had invoked his right to an attorney at the courthouse when I first met him.

RP (Trial 1) at 225. "RP (Trial 1)" refers to the single volume reported by Renee L. Munoz that includes the proceedings taking place in May 2019, including the aborted first trial. Defense counsel's objection was sustained and the mistrial granted. *Id.*

9

> Case law says that lack of criminal history or, essentially, what's reverse 404(b) is not admissible in the first instance. It's excluded.
>
> If counsel believes that there is evidence that's come in that changes what would otherwise be the default rule, that will need to be addressed outside of the jury in the first instance.
>
> So granted at this time. Counsel can raise the issue if they believe that the situation has changed.

RP (Trial 3)[6] at 81.

Most concerning to the trial court were Eduardo's lawyer's statements during his opening statement that after Eduardo returned to Connecticut in 1998, "years go by. And there's no indication that Eduardo did anything but work, *obey the law*, play with his kids, raise a family, give credits as best he could to his community," and that the police "don't find Eduardo being picked up on kidnapping children or having child pornography or anything of the sort. They find Eduardo for one reason: Somebody else rear-ended him." RP (Trial 3) at 584-85 (emphasis added). Alex's lawyer expressed concern that unlike the case with Eduardo, jurors would not be told that Alex had been law-abiding for the prior 20 years. The court granted the request for a mistrial, explaining, "There's no instruction that I can give that can assure me that [Alex] will receive a fair trial going forward." RP (Trial 3) at 625.

---

[6] RP (Trial 3) refers to the two consecutively-paginated volumes reported by Katie DeVoir that include the third trial taking place in August 2019. They also include the January 2020 hearing on Eduardo's motion for a new trial.

The fourth trial began on September 30. Called as witnesses by the State were a Norwalk, Connecticut, police officer who located and arrested the brothers at Benton County's request; Detective Cantu and Detective Scott Monds, who traveled to Connecticut with Detective Cantu to transport Eduardo back to Washington; Julian and Emiliano's father, Santiago; Principal Juzeler; Emiliano; Julian; and the sex abuse counselor who participated in interviews in 1995.[7] Detective Cantu, Principal Juzeler and the sex abuse counselor testified consistent with the facts set forth above.

Detective Cantu also testified that after he and Detective Monds picked up Eduardo at a Norwalk courthouse, they drove to LaGuardia Airport, and during the drive, Eduardo told the detectives he had moved to Connecticut but returned to Prosser following the 1997 DUI charge. Detective Cantu testified Eduardo told Detective Monds and him that he left Prosser again to return to Connecticut when he learned authorities needed to speak with him about the charges at issue in this case.

Detective Monds agreed when questioned that Eduardo admitted to fleeing Washington and returning to Connecticut when he learned of Detective Cantu's investigation. He also testified that Eduardo had stated during the drive that "he had made some mistakes when he was younger and he was paying the consequences for them now." RP (Trial) at 920.

---

[7] Urbina had died a couple of years before the trial.

Santiago testified that Alejandro had lived with the family at the Highway 22 mobile home park for a time and also lived with the family off and on when they moved to the Prosser trailer park. He testified that when Detective Cantu contacted him about Julian's and Emiliano's allegations, he knew Urbina and her sons had moved to a different state and had been told they were in New York, which he mentioned to the detective. Asked by Alex's lawyer if he recalled that Urbina had a nephew "in the area" who was named Alejandro Martinez, Santiago said he did, but he did not know where he lived or who he had worked for. RP (Trial) at 893-94.

Emiliano testified to being born in March 1988, making him 31 years old at the time of trial. He testified that he recalled the abuse by Alejandro and Emiliano happening during the first quarter of his second-grade year. Alejandro was the first to abuse him by putting his penis in Emiliano's mouth; then he inserted his penis in Emiliano's anus "repeatedly." RP (Trial) at 1042. He testified that this occurred in the bedroom, and both of his younger brothers were present in the trailer. He testified that Eduardo had not been present during this incident.

Emiliano testified that Eduardo later assaulted him as well, calling him into that room again, where he "proceeded to pull my pants down and insert his penis in my anus." RP (Trial) at 1044. Emiliano testified he was raped by Eduardo on more than one occasion, often in the bedroom. The rapes always occurred in the family's trailer.

12

Asked if he was able to fight back, he said he could not because Alejandro and Eduardo were older, bigger and stronger. In the fall of 1995, when this is alleged to have occurred, Alejandro would have been 16 years old and Eduardo would have been nearly 15.

Emiliano testified that he knew his younger brother Julian had also been raped, "[b]ecause it happened to me" and "I could just hear him screaming, begging for him to stop." RP (Trial) at 1045. He testified that he also saw Julian being raped once, in the trailer's bathroom. Emiliano testified that he never talked to Julian or anyone else about the abuse, because he was scared and "they threatened us." RP (Trial) at 1046.

Julian testified to being born in 1989, making him 30 years old at the time of trial. He testified that he was assaulted by Eduardo, who took him in the back room of the trailer and put his penis in Julian's anus. He remembered pain, that he was crying, and that it was against his will. He also recalls that it happened on a few occasions. Emiliano was present in the trailer when it happened. Julian testified he knew it happened to Emiliano, too, because Emiliano was taken to the back room and Julian could hear him crying. Julian did not fight back because Eduardo was older than him and he was scared. It happened in the first quarter of his first-grade year, so he would have been 6 years old at the time. Julian testified that Alejandro never molested him.

Alex and Eduardo testified in their own defense. Alex testified that others have referred to him as Alejandro, but he, personally, has always gone by Alex. Asked about

13

his birthdate, he testified that he was born on March 21, 1978, which is not the date of birth attributed to him by the State. He testified that he came to the United States in 1991 and lived with a family acquaintance in Grandview. He occasionally stayed with his mother in the Prosser trailer park once she returned to the United States.

Alex testified that in November 1995, he left Washington with plans to go to Chicago, but ended up going to Connecticut. He testified that he moved to Mexico in 1998, stayed for about a year, and then returned to Connecticut where he continued to live until the charges in this case brought him back to Washington. He described his work history, which ultimately led to his owning and operating an auto repair shop with Eduardo. He testified that he had married in 2015 and that he and his wife reside on the main floor of a duplex in Bridgeport, with Eduardo and his family residing upstairs.

Alex testified that the first he ever heard of the charges against him in Washington was in March 2019, when police came to his home looking for him and Eduardo. He denied meeting Detective Cantu at any time prior to 2019. He testified that his cousin Alejandro Martinez was a couple of years older than him and he believed he had lived in Prosser in 1995. He denied ever molesting Emiliano.

In cross-examination, the State questioned Alex about a school record from Prosser High School that identified student "Alejandro S. Martinez." RP (Trial) at 1304. The record listed Alejandro's parent or guardian as Urbina Martinez, identified him as living at the Highway 22 mobile home park address, and it reflected the date of birth that

14

Detective Cantu had obtained from the "Alejandro Martinez" he interviewed in 1998.

Alex testified that, while he could not say that such a record "would have been incorrect,

it wasn't me." RP (Trial) at 1303.

Eduardo testified after Alex. In his direct examination, Eduardo confirmed that

he, his mother, Santiago and Santiago's sons originally lived in a mobile home on

Highway 22 and then lived in the trailer at the Prosser trailer park between the summer of

1994 and the fall of 1995. He described Alex as not having lived with the family, but

occasionally staying a few nights here and there.

According to Eduardo, he first left Washington in February 1996. He had dropped

out of school, and Alex had driven from Connecticut to pick him up. In October 1997, he

received the DUI in Connecticut and, fearful of problems the DUI could cause, he

returned to Washington in February 1998 and lived with his mother. He testified that he

remained in Washington for only four months.

Eduardo denied having any knowledge of the investigation or pending case against

him in Washington until sometime after his November 2018 auto accident. It was during

the revived proceedings on his 1997 DUI that he learned about it from Connecticut law

enforcement. He denied ever telling Detectives Cantu and Monds that he fled

Washington when he learned the police were looking for him; he testified that he only

told them about fleeing Connecticut for Washington after being charged with the DUI.

He also testified that the only mistake and regrets he mentioned to Detectives Cantu and

15

Monds during the drive to the airport had to do with not taking care of the DUI back in 1997 and 1998. He denied ever having sex with Julian or Emiliano.

In questioning by Alex's lawyer, Eduardo testified that he believed his cousin Alejandro Martinez was older than Alex, but could not say for sure. He did not know where he had worked, other than that he was "basically working in the field." RP (Trial) at 1328.

The jury found the brothers guilty as charged. At sentencing, Alex asked (against the advice of counsel) to be sentenced to the same amount of time as Eduardo. Based on a seriousness level of XII, the court imposed a 120-month sentence with a mandatory 24-month community custody for both defendants. Eduardo appeals.

## ANALYSIS

Eduardo makes four assignments of error. He assigns error to (1) a violation of his constitutional right to a speedy trial, (2) the trial court's granting the State's motion for joinder, (3) a violation of his right to be free of double jeopardy when the trial court declared the third trial a mistrial, and (4) the denial of his motion for a new trial. We address the alleged errors in turn.

I.    BECAUSE NO SPEEDY TRIAL CHALLENGE WAS RAISED IN THE TRIAL COURT, THE RECORD IS INSUFFICIENT FOR REVIEW

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution both protect a criminal defendant's right to a speedy

16

trial. The analysis of the rights they provide is substantially the same. *State v. Ollivier*, 178 Wn.2d 813, 826, 312 P.3d 1 (2013). The right to a speedy trial attaches when a charge is filed or an arrest is made, whichever occurs first. *State v. Lee*, 188 Wn.2d 473, 498, 396 P.3d 316 (2017); *State v. Shemesh*, 187 Wn. App. 136, 144, 347 P.3d 1096 (2015). If a defendant's constitutional right to a speedy trial is violated, the remedy is dismissal of the charges with prejudice. *State v. Iniguez*, 167 Wn.2d 273, 282, 217 P.3d 768 (2009).

We use the balancing test set out by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), to determine whether a constitutional violation has occurred. *Ollivier*, 178 Wn.2d at 827. That test recognizes the relevance of four separate inquiries: whether delay before trial was uncommonly long; whether the government or the criminal defendant is more to blame for that delay; whether, in due course, the defendant asserted the right to a speedy trial; and whether the defendant suffered prejudice as the delay's result. *Doggett v. United States*, 505 U.S. 647, 651, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992) (citing *Barker*, 407 U.S. at 530).

The first of the inquiries is actually a double inquiry: initially, to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial "has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." *Id.* at 651-52. "[B]y definition, [the defendant] cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary

17

promptness." *Id.* at 652. A finding of presumptively prejudicial delay does not mean that

the right to a speedy trial has been violated but rather that the delay is sufficient to trigger

the four-factor *Barker* analysis. *Ollivier*, 178 Wn.2d at 828.

A. Presumptive prejudice and the length of delay weigh in favor of Eduardo's speedy trial challenge

There is no specific time period that triggers the presumption of prejudice and it is

often a "fact-specific inquiry dependent on the circumstances of each case." *Iniguez*, 167

Wn.2d at 291. Not so here. The charges against Eduardo were filed on December 14,

1998, and he was not brought to trial for over 20 years. This delay exceeds many other

cases where the length of the delay was found presumptively prejudicial. *See, e.g.*,

*Doggett*, 505 U.S. at 652 (over 8-year delay); *Ollivier*, 178 Wn.2d at 827-28 (23-month

delay). The State agrees the delay here is "certainly" presumptively prejudicial. Br. of

Resp't at 13.

The first *Barker* factor, the length of the delay, examines "the extent to which the

delay stretches beyond the bare minimum needed to trigger" the full four-factor inquiry.

*Doggett*, 505 U.S. at 652. A longer delay spurs a closer examination into the

circumstances surrounding the delay. *Iniguez*, 167 Wn.2d at 293. Here, too, the State

concedes that the extraordinary length of the delay weighs in favor of Eduardo's speedy

trial challenge.

B.     The remaining factors cannot be examined or weighed without the presentation of evidence and fact-finding

The factors of reasons for delay, assertion of the speedy trial right, and prejudice turn on evidence and argument that was never presented and advanced in the trial court, given that no motion to dismiss on speedy trial grounds was ever made by Eduardo.

The government has the burden of explaining its delay in bringing a defendant to trial. *United States v. Brown*, 169 F.3d 344, 349 (6th Cir. 1999). The government has "'some obligation'" to pursue a defendant in order to bring him to trial. *United States v. Mendoza*, 530 F.3d 758, 762-63 (9th Cir. 2008) (quoting *United States v. Sandoval*, 990 F.2d 481, 485 (9th Cir. 1993)). The effort need only be reasonable, not heroic. *Sandoval*, 990 F.2d at 485; *United States v. Machado*, 886 F.3d 1070, 1080 (11th Cir. 2018) (the government is not required to exhaust all conceivable avenues). "[I]f the defendant is not attempting to avoid detection and the government makes no serious effort to find him, the government is considered negligent in its pursuit." *Mendoza*, 530 F.3d at 763.

By contrast, where the government's failure to locate the defendant results from the defendant's flight from justice or deliberate disappearance, the delay is properly attributed to the defendant. *See United States v. Bagster*, 915 F.2d 607, 611 (10th Cir. 1990). And when a defendant knows of his indictment long before his arrest but fails to

take action to obtain a speedy trial, the third factor—assertion of the speedy trial right—weighs heavily against him. *See Doggett*, 505 U.S. at 653.

When there is conflicting evidence whether the government sought a defendant with diligence and whether a defendant was aware of the charges against him for years, factual determinations must be made in the trial court, to which we defer. *Id.* at 652-53. We cannot say that those disputed facts were determined by the jury's guilty verdicts. While the parties offered evidence on both scores, it is possible the jury found the rapes were committed because they believed Emiliano and Julian. The jury could have found guilt and yet not believed the State's evidence that Alejandro and Eduardo had been aware of Detective Cantu's investigation since 1998.

Because no speedy trial dismissal motion was made, the State had no reason to present all the evidence it may have to explain its delay in bringing Eduardo to trial. The trial court has not had the opportunity to decide the disputed factual issues on which the remaining three *Barker* factors and their balancing may depend.

If the facts necessary to adjudicate a claimed error are not in the record on appeal, no actual prejudice can be shown and an error, even if of a constitutional character, is not manifest. *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995). It cannot be reviewed on direct appeal. *Id* .at 334; RAP 2.5(a). The proper mechanism for raising claims of error that rest on facts outside the record is a personal restraint petition. *State v.*

No. 37344-4-III
*State v. Martinez*

*Robinson*, 171 Wn.2d 292, 315, 253 P.3d 84 (2011) (Madsen, C.J., dissenting) (citing

*McFarland*, 127 Wn.2d at 338).

II.      EDUARDO DOES NOT DEMONSTRATE AN ABUSE OF DISCRETION IN ORDERING
         JOINDER

Eduardo challenges the trial court's order permitting joinder of the State's cases

against him and Alex.  He does so on a basis he agreed at oral argument is "considerably

different" from the more typical challenge to joinder being made by Alex in his appeal.

Wash. Court of Appeals oral argument, *State v. Martinez*, No. 37344-4-III (Dec. 6, 2021)

at 58 sec. to 1 min., 5 sec.  Rather than argue that he was prejudiced by the admission of

evidence that would not have been admitted had he been tried alone, Eduardo argues that

the State is to blame for the first mistrial and by permitting joinder thereafter, the trial

court is "allowing the government to undermine Eduardo's Fifth Amendment privilege

against self-incrimination."  Br. of Appellant at 23-24.

It was Eduardo who moved for declaration of the first mistrial.  As he concedes,

the trial judge made clear in granting Eduardo's mistrial motion that he did not believe

Detective Cantu had intended to sabotage the trial.[8]  Eduardo never asked that the charges

against him be dismissed with prejudice following the first mistrial on the basis that the

prosecutor goaded Eduardo into moving for a mistrial, which is a narrow exception to the

---

[8] In announcing its decision, the trial judge addressed the detective, and stated, "Detective Cantu, I don't think for a moment that you talked about his invoking his rights on purpose or with any bad intent or poor motive.  I want you to know that."  RP (Trial 1) at 241.

21

rule that double jeopardy generally does not bar retrial after a defendant moves for a mistrial. *State v. Thompson*, 19 Wn. App. 2d 727, 740-41, 498 P.3d 40 (2021); *United States v. Dinitz*, 424 U.S. 600, 611, 96 S. Ct. 1075, 47 L. Ed. 2d 267 (1976).

Eduardo implicitly contends that the consolidated trial against the brothers strengthened the State's case or made the case against him harder to defend, because he argues it allowed the prosecutor to "better position her case," "completely change[d] the dynamics of his defense," and punished him after the fact for invoking his right to counsel. But his briefing of this assigned error makes no effort to identify any particular respect in which he was prejudiced. *See* Br. of Appellant at 22-24. It is not the role of this court to read the trial transcript and figure out for ourselves whether he was prejudiced in some way.

The "unfairness" Eduardo needed to focus on in hopes of persuading us that it was an abuse of discretion to order joinder is *unfairness occurring as a result of the consolidated trial*, not the asserted unfairness that in the first trial Detective Cantu should never have mentioned Eduardo's request for counsel, but did. Since no unfairness occurring as a result of the consolidated trial is identified, no abuse of discretion is shown.

III.    THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN FINDING A MANIFEST
        NECESSITY TO DECLARE A MISTRIAL IN THE THIRD TRIAL

Eduardo objected when the trial court declared a mistrial in his third trial.  He

argues on appeal that the trial court improperly goaded Alejandro's lawyer into

requesting the mistrial, there was no "manifest necessity," and the fourth trial therefore

constituted double jeopardy.

By way of further background, Eduardo had resisted the State's motion prohibiting

evidence or argument that he had no prior criminal convictions or suggesting that he was

a law-abiding citizen.  His lawyer argued, "I think it's relevant," "they can't point to one

person who's ever accused him of behaving inappropriately," and "He's never been

charged with a crime."  RP (Trial 3) at 80-81.  The State's motion had accurately

described the limits on character evidence imposed by the evidence rules, however.  The

trial court clearly granted the motion and imposed the exclusion.

The trial court reasonably viewed its ruling as violated when Eduardo's lawyer

told jurors in opening statement that "there's no indication that Eduardo did anything but

. . . obey the law," and that police had not picked up Eduardo for "kidnapping children or

having child pornography or anything of the sort."  RP (Trial 3) at 584-85.  After all of

the opening statements were concluded and outside the presence of the jury, the trial

court asked the court reporter to read back parts of the opening statement that it believed

contravened its ruling.  It informed the parties that he was excusing the jury for the day

23

and would address the perceived violation the next morning, inviting them to submit briefing and any remedy they believed was appropriate.

The State responded with argument that the statements had been "in direct violation of the Court's order" and proposed an instruction to jurors that the lawyers' statements were not evidence and must be disregarded if not supported by the evidence. CP at 373.

Alex's lawyer did not take a position on the violation but recognized that the statements likely prejudiced his client, observing that jurors would wonder, "Why didn't Alex have a [sic] good character evidence?  Therefore he must be guilty!" CP at 399.  He moved for severance and a new trial.[9]

Eduardo's lawyer responded that he had not intended to violate the order and apologized if he did, but said he thought he was only prohibited from stating that Eduardo "has no criminal record." CP at 415.  He argued that evidence rules cannot prohibit a lawyer from "humaniz[ing] the defendant" and "portraying [him] as good and decent." CP at 415.

The trial court heard argument the following morning.  It explained its concern that "when one counsel indicates that their client was law-abiding, there is a negative inference when counsel following the Court's instruction doesn't make the same

---

[9] He later withdrew his motion for severance.

24

assertion." RP (Trial 3) at 615. Alex's lawyer agreed that was his concern in requesting a mistrial. After hearing from all the parties, the trial court stated that the State's proposed instruction could not assure him that Alex would receive a fair trial, and it would grant the mistrial motion.

Double jeopardy rights protect a defendant from "a second prosecution for the same offense after conviction or acquittal, and from multiple punishments for the same offense" after jeopardy attaches. *State v. Jones*, 97 Wn.2d 159, 162, 641 P.2d 708 (1982). Jeopardy attaches once a jury is empaneled and sworn. *State v. Sheets*, 128 Wn. App. 149, 155, 115 P.3d 1004 (2005). Retrial is not automatically barred when a proceeding is terminated upon declaration of a mistrial. *Arizona v. Washington*, 434 U.S. 497, 505, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978). When a mistrial is granted without the defendant's consent and after jeopardy has attached, a retrial is barred by double jeopardy unless the mistrial was justified by a "'manifest necessity.'" *Sheets*, 128 Wn. App. at 151-52 (quoting *State v. Graham*, 91 Wn. App. 663, 667, 960 P.2d 457 (1998)); *State v. Melton*, 97 Wn. App. 327, 331, 983 P.2d 699 (1999) (quoting *Graham*, 91 Wn. App. at 667); *State v. Wright*, 165 Wn.2d 783, 793, 203 P.3d 1027 (2009) (quoting *Graham*, 91 Wn. App. at 667).

Appellate courts give great deference to the trial court's decision to declare a mistrial. *State v. Strine*, 176 Wn.2d 742, 753, 293 P.3d 1177 (2013). Our concern is that the trial court exercise "'sound discretion.'" *Id.* (quoting *United States v. Perez*, 22 U.S.

25

(9 Wheat.) 579, 580, 6 L. Ed. 165 (1824)).  "Manifest necessity" in this context is not interpreted literally; it is present when there is a high degree of necessity.  *Id.* (citing *Renico v. Lett*, 559 U.S. 766, 774, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010).  Three procedural factors are important:

> (1) whether the court act[ed] precipitately [or] gave both defense counsel and the prosecutor full opportunity to explain their positions; (2) whether it accorded careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding; and (3) whether it considered alternatives to declaring a mistrial.

*State v. Robinson*, 146 Wn. App. 471, 479-80, 191 P.3d 906 (2008) (alterations in original) (internal quotation marks omitted) (quoting *Melton*, 97 Wn. App. at 332).

Each of the procedural concerns is satisfied here.  The trial court did not act precipitately.  It stated its belief that statements had been made in contravention of its ruling but before taking action, identified the statements clearly and recessed, giving the parties an opportunity to consider the record and respond with any suggestions as to what, if anything, should be done.  It then heard argument from all of the parties and considered the two suggestions made: a curative instruction or a mistrial.  The court's action was deliberate and measured.

Eduardo argues on appeal that "[t]he harm caused to [Alex] could have been easily cured," Br. of Appellant at 26, but notably, Eduardo was the only party who had no suggestion for how the court should address counsel's violation (nor does he offer one on

26

appeal). *See* CP at 412-15; RP (Trial 3) at 621-24. Rather, his lawyer told the court,

"[W]hatever you decide, I'm okay with." RP (Trial 3) at 624.

The trial court did not err in finding a manifest necessity to declare a mistrial.

IV.     THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING EDUARDO'S
        MOTION FOR A NEW TRIAL

Finally, Eduardo argues that the trial court erred in denying his motion for a new

trial. His motion raised two grounds: first, that his "right to a fair trial before an impartial

jury was destroyed by the hostile relationship between [Alejandro's lawyer, Kevin] Holt,

and [Laurel] Holland[, the prosecutor]"; and second, that his "right to zealous

representation was seve[rely] limited when the court warned his counsel that he, counsel

for defendant, would face sanctions, removal from the case, and reporting to the bar for

disciplinary action if he attempted to play to the jur[y's] emotions and/or failed to act

within the orders of the court." CP at 490 (capitalization omitted).[10]

The court warning that was a basis for the new trial motion was delivered after

Eduardo's questioning of Detective Cantu was cut off by an objection that the parties

were invited to brief overnight. Eduardo's lawyer had asked if the detective was "trained

as to the type of people who commit these crimes against children," and the detective

answered, "I don't know if there is a specific type of people that commit those crimes.

---

[10] Eduardo's appellate brief also criticizes the trial court's rulings sustaining
objections to questions about pedophilia and immigration, but those rulings were not a
basis for the new trial motion and have not separately been assigned as error. We will not
address them. *See* RAP 10.3(a)(4) (requiring separate concise statements for each error).

It's people commit crimes against children." RP (Trial) at 749. Counsel then asked,

"So—have you ever heard of the term pedophile?" which drew an objection from the

State. *Id.* The objection was sustained, the jury was excused, and whether pedophilia

was relevant was briefly discussed. When Eduardo's lawyer insisted it was relevant, the

trial court recessed for the evening and invited the parties to return in the morning with

any legal authority for or against its relevance to the case. RP (Trial) at 752.

After lengthy argument about its relevance the next morning, the trial court ruled

that it had sustained the objection, did not believe Eduardo had established a good faith

basis for its question to the detective, and "in any case, the court has made a ruling in that

regard and I expect counsel to abide by that ruling." RP (Trial) at 769.

It then delivered the admonition that became a basis for Eduardo's new trial

motion:

> There are some other issues the court, I guess, out of an abundance of
> caution, believes it needs to address with the parties. Any questioning
> designed to elicit an emotional or prejudicial response from the jury, I think
> it's to show sympathetic or prejudicial response from the jury, I think it's
> clear in the law that that is not appropriate. I would expect counsel to
> refrain from any such type of questioning designed solely to elicit some
> type of sympathy or prejudice from the jury.
>
> In regards to, again, character, just so the only basis for admitting
> character evidence would be, again, if it's a pertinent trait to the crime
> charged and it's done by way of a reputation in a general community. I
> expect counsel to—for all parties—to refrain from any such questioning
> or attempts to present that type of evidence other than in the parameters
> established by the court.

28

Again, any violation of the order the court would consider whether sanctions are appropriate up to and including removal from the case and whether referral to appropriate bar associations is appropriate under the circumstances.

RP (Trial) at 769-70.  When Alex's lawyer expressed his perception that the trial court's comments were in response to "the State's many, many, many condescending remarks toward us" and could chill the defense, the trial court responded:

It's not my intention to chill your presentation.  If you feel, certainly, that you have a legitimate basis regarding one of these issues the court addressed, certainly we can address that outside the presence of the jury before you go forward with the questioning and the court may in fact at that point agree with you, based on how the evidence comes out.  But I would like that to be done outside the presence of the jury.

RP (Trial) at 771, 774-75.

The State argued in response to Eduardo's new trial motion that he failed to point to any evidence of the jurors being exposed to hostilities, and jurors were ordinarily not present when disagreements were aired.  It disagreed with Eduardo's characterization of the court's admonition, which it contended was reasonable and directed to all counsel.

After hearing oral argument of Eduardo's new trial motion, the trial court denied it with the following explanation:

I did not see anything during the course of this trial which suggested to me that there was any substantial chilling of [Eduardo's lawyer's] performance in this matter that would warrant a finding of ineffective assistance of counsel that prevented a fair trial.  I have not been referred to any specific instances where that was the case; so I don't think the defense has met the burden of establishing that the Court's rulings were such that it chilled

29

defense's presentation to the point where there were ineffective assistance of counsel and the inability to achieve a fair trial.

> With regard to the second issue, regarding the exchanges between [defense counsel] and [the prosecution] and whether or not those rose to a level where it prevented Mr. Eduardo Martinez from having a fair trial in this matter, there were some fairly substantial discussions and somewhat heated discussions, I recall, from counsel; but it's also my recollection that those were done primarily outside the presence of the jury. And this court tried to make sure that, when those were raised, that we did in fact remove the jury and we had those discussions outside the presence of the jury. I think there was very minimal heated argument, if any at all, between counsel in front of the jury that would suggest that, because of the relationship and behavior of either defense counsel or the prosecution, that Mr. Martinez was precluded from having a fair trial.

RP (Trial 3) at 652-53.

CrR 7.5(a)(5) provides that a trial court may grant a new trial if a defendant was prevented from having a fair trial as the result of an irregularity in the proceedings or an order of court or abuse of discretion. A trial judge's decision on a motion for a new trial is reviewed for abuse of discretion. *State v. Marks*, 71 Wn.2d 295, 302, 427 P.2d 1008 (1967). "In a criminal proceeding, a new trial is necessitated only when the defendant 'has been so prejudiced that nothing short of a new trial can ensure that the defendant will be treated fairly.'" *State v. Bourgeois*, 133 Wn.2d 389, 406, 945 P.2d 1120 (1997) (quoting *State v. Russell*, 125 Wn.2d 24, 85, 882 P.2d 747 (1994)). "Something more than a possibility of prejudice must be shown." *State v. Lemieux*, 75 Wn.2d 89, 91, 448 P.2d 943 (1968).

In light of the State's argument that Eduardo failed to support his argument by pointing to anything in the record, and the trial court's ruling that the record did not support Eduardo's arguments, it is essential that Eduardo show us *there is* support in the record for his contentions. It is fatal to this assignment of error that he does not. A party's brief must include "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." RAP 10.3(a)(6). Each factual statement in the appellant's statement of the case must also refer to the record. RAP 10.3(a)(5). "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Brownfield v. City of Yakima*, 178 Wn. App. 850, 876, 316 P.3d 520 (2014). And we do not "consider conclusory arguments that are unsupported by citation to authority." *In re Pers. Restraint of Sickels*, 14 Wn. App. 2d 51, 58 n.2, 469 P.3d 322 (2020).

Clearly, the judge who presided at the trial is in the best position to assess whether the defense counsel/prosecution interactions and admonition about questioning witnesses had an effect on jurors or on the defense lawyers' performance. If a party expects an appellate court to second-guess the trial judge on an issue like this, the party needs to point to evidence in the trial record that demonstrates the trial judge was wrong. To repeat what was said earlier, it is not the role of this court to read the trial transcript and figure out for ourselves if Eduardo was prejudiced in some way.

31

No. 37344-4-III
*State v. Martinez*

The convictions are affirmed, but we remand for resentencing in accordance with the seriousness levels and sentencing ranges in effect at the time of the crimes. *See State v. Martinez*, No. 373436, slip op. at 33-35.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Fearing, J.

_____
Pennell, J.